**Guo–Le HUANG, Petitioner,**

v.

**Alberto R. GONZALES,\* Attorney General, Respondent.**

**Docket No. 04–1032–ag.**

United States Court of Appeals, Second Circuit.

Argued: March 29, 2006.

Decided: June 29, 2006.

\* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Alberto R. Gonzales is automatically substituted for former Attorney General John Ashcroft.

Before FEINBERG, NEWMAN, and KATZMANN, Circuit Judges.

NEWMAN, Circuit Judge.

This petition for review of a decision by the Board of Immigration Appeals ("BIA") denying a claim for asylum presents the recurring issue of whether a determination that the asylum applicant lacked credibility is sustainable and, if the BIA's decision is vacated, the additional issue of whether on remand the matter should be reassigned to a different Immigration Judge ("IJ") because of an appearance of bias. Petitioner Guo–Le Huang ("Huang") petitions for review of an order of the BIA affirming the decision of IJ Jeffrey S. Chase, which denied Huang's application for asylum and withholding of removal under the Immigration and Nationality Act, 8 U.S.C. § 1400 et seq. (the "INA"). We conclude that the credibility determination is flawed and that the remarks of IJ Chase during the questioning of the applicant create an appearance that he cannot impartially adjudicate this case. We therefore remand for reassignment to a different IJ.

## Background

Petitioner Huang [1], a Chinese native, entered the United States in Tampa, Florida, on April 26, 1999. Immigration officials caught him trying to enter the country using a Japanese passport. The Immigration and Naturalization Service ("INS") [2] promptly commenced exclusion proceedings. Huang later applied for admission

Hanbin Wang, New York, N.Y., for Petitioner.

Craig A. Oswald, Asst. U.S. Atty., Chicago, IL (Patrick J. Fitzgerald, U.S. Atty., Edmund E. Chang, Lashonda A. Hunt, Carole J. Ryczek, Asst. U.S. Attys., Chicago, IL, on the brief), for Respondent.

1. Huang's name occasionally appears in the record as Jang.

2. Effective March 1, 2003, "the INS ceased to exist as an agency under the umbrella of the Department of Justice" and "[i]ts immigration enforcement functions thereafter were transferred to the Department of Homeland Security," *Edwards v. INS*, 393 F.3d 299, 304 n. 5 (2d Cir.2004), and assigned to the Under Secretary for Border and Transportation Security. See Homeland Security Act of 2002, Pub.L. No. 107–296, § 441, 116 Stat. 2135, 2192 (Nov. 25, 2002). Because the proceedings in this case began before that date, we will continue to refer to the "INS."

under the Visa Waiver Pilot Program. Under this system, the alien has an early opportunity to have an asylum claim heard, but is not immediately placed in removal proceedings.

*The Airport Interview.* Upon arrival at Tampa International Airport in Florida, an INS Asylum Officer interviewed Huang and recorded his answers in a sworn statement. Huang stated that the Chinese government forced his wife to have an abortion when she was pregnant with their second child. He also stated that the government officials had previously destroyed his house and assessed a fine, and that he feared future arrest.

*The "Credible Fear" Interview.* In May 1999, an officer of the INS interviewed Huang. Huang stated that government officials performed the abortion in September 1998, in the ninth month of his wife's pregnancy. He also elaborated on the previous incident when government officials ("cadres") destroyed his house. He stated that the cadres were looking for his wife in order to perform an abortion and that the attack occurred when he confronted them by saying that "the Chinese government does not recognize human rights and does not recognize humanity." The cadres slapped him in the face and took down his windows and doors. Huang also testified that he had a conversation about sterilization with a doctor when his wife had the abortion. The doctor would not sterilize his wife (by tubal ligation) at that time because she was too weak from the abortion. Huang then feared that he would be sterilized instead of his wife, went into hiding, and fled the country.

*Huang's Asylum Application.* Huang completed an application for asylum in September 1999, claiming that he faced persecution because of China's family planning policy. Huang stated that he and his wife secretly had a daughter in 1988, but gave that child up for adoption. Huang and his wife openly had a son in 1990. After that birth, the government forced his wife to use an IUD. In 1997, the Huangs secretly had a private doctor remove the IUD, and Huang's wife became pregnant in January 1998. In July 1998, Huang had his confrontation with the village cadres when they came looking for his wife. In September 1998, the cadres discovered Huang's wife and forcibly aborted her pregnancy. Huang stated that this event occurred one month before her due date. Huang also explained the inconsistency between this statement and his statement in his credible fear hearing that the abortion occurred in the ninth month of pregnancy by stating that he thought at the time that pregnancy lasted ten months, not nine. Finally, Huang said that village cadres threatened him and his wife with sterilization, but after his wife apologized for the confrontation, they allowed her to have an IUD inserted instead.

*Appearances before IJ Chase.* Huang appeared before IJ Chase on several occasions before a hearing on the merits of his application was held on September 20, 2001. The pertinent aspects of what transpired on those occasions relating to the appearance of bias on the part of the IJ are detailed later in this opinion. *See* Part VI, infra. At the merits hearing, Huang testified about his wife's forced abortion in September 1998. He said that he was away at the time, but his wife told him that the cadres had taken her to have the abortion and that she had remained in the hospital for a few days because she had lost a lot of blood. He also testified about his confrontation with the village cadres in July 1998. Finally, he testified that he feared arrest and physical abuse if he returned to China.

On cross-examination, the Government asked Huang about a document confirming

that his wife had had an abortion. Huang testified that his wife obtained the document from the hospital after the abortion, as a "receipt." The Government also asked Huang to explain why this document listed his wife's occupation as "farmer," but his household registration listed the household as "non-agricultural." Huang explained that they had been assigned to a farm, but the Chinese government took the farmland to build a road, and his family was re-assigned to a residential household.

Later in the cross-examination, the Government asked Huang whether he had given up for adoption his first child, who was a girl. Huang confirmed that he and his wife had done so. IJ Chase's interjections at this point in the cross-examination are detailed in Part VI, *infra*. After brief Government cross-examination, IJ Chase questioned Huang about a document his wife received from the village cadres in June 1999. The document states that Huang's wife "severely violated the family planning policy," and notes that she had an abortion "enforced" upon her in September 1998 and an IUD inserted in November 1998. IJ Chase asked Huang to explain why the village cadres would give his wife a document admitting that it forced her to have an abortion. Huang stated that the purpose of the document was to show that she had an IUD inserted and that there was no need for anything further to be done.

*IJ Decision.* The IJ issued an oral ruling in July 2002, denying the application for asylum and withholding of removal. The IJ found that Huang's testimony lacked credibility, based on several factors. First, he concluded that the document from the village cadres admitting that they had forced Huang's wife to undergo abortion was "clearly ... fraudulent." The IJ saw no reason why the village cadres

would admit to carrying out persecution that the Chinese national government regularly denies. Second, he concluded that the July 1998 confrontation with village authorities was fabricated. He reasoned: "An uneducated villager, such as the applicant, really would not be making human rights arguments, basing it on forms of government or a government's ideology." Third, he disbelieved Huang's testimony that his wife could not be sterilized immediately after she had her abortion. He said that he did not understand why she would have been too weak to undergo tubal ligation. He faulted Huang for failure to explain this proposition with medical documentation. Fourth, he faulted Huang for giving up his first child for adoption because she was a girl. He described this act as "a very sexist act, a very, if we are talking about human rights, inhumane act, and his reasons for doing it were highly selfish." He contrasted Huang's "troublesome viewpoint" with the idea that "in this society that we live in America, parents generally believe in sacrificing for their children."

IJ Chase concluded that Huang's testimony was not credible and denied him asylum and withholding of removal.

*BIA decision.* On appeal to the BIA, Huang argued that the adverse credibility ruling was based on speculation and that the IJ was biased against him. The BIA issued a two-page opinion dismissing Huang's appeal. The opinion explicitly accepted only one of the IJ's four reasons— the submission of fraudulent documents— but noted generally that "as the Immigration Judge found, [Huang] made certain false statements and presented a fraudulent document."

The BIA also added three of its own reasons for disbelieving Huang's testimony. First, it faulted Huang for being inconsistent as to the month of the preg-

nancy in which the abortion occurred. Second, the BIA concluded that another material inconsistency existed between Huang's application, which stated that he lived in a non-agricultural area, and a document from a hospital, which indicated that his wife was a farmer. Third, the BIA wrote that "despite the assistance of counsel, the respondent's testimony was confusing and nonresponsive."

Huang filed a timely petition for review.

## Discussion

### I. Standard of Review

Our standard of review—whether the findings are supported by substantial evidence—is well established. *See INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992); *Ramsameachire v. Ashcroft,* 357 F.3d 169, 177–78 (2d Cir.2004); *Wu Biao Chen v. INS,* 344 F.3d 272, 275 (2d Cir.2003); *Diallo v. INS,* 232 F.3d 279, 287 (2d Cir.2000).

### II. Appellate Jurisdiction

This Court recently decided that we have jurisdiction to review the denial of an application for asylum, despite the absence of a final order of removal, in a so-called "asylum only" proceeding such as the pending case. See *Kanacevic v. INS,* 448 F.3d 129, 135 (2d Cir.2006).

### III. Whether Substantial Evidence Supports the Adverse Credibility Finding

■ A threshold matter on this issue is whether we should review the reasons given by the BIA, the IJ, or both. Huang's brief inconsistently asks us to review only the BIA opinion and also the IJ's opinion. The Government asks us to review the IJ's decision. In this case, the BIA affirmed the decision of the IJ with a short opinion and added some reasons of its own. "This Court generally reviews only the final order of the BIA, but when the BIA adopts the IJ's decision and supplements it, this Court reviews the decision of the IJ as supplemented by the BIA." *Yu Yin Yang v. Gonzales,* 431 F.3d 84, 85 (2d Cir.2005). Accordingly, we consider the reasons for the adverse credibility finding given by both the IJ and the BIA.

### A. The IJ's Reasons

*The fraudulent letter.* The IJ found that Huang's letter from the village cadres admitting to have forced an abortion on Huang's wife was fraudulent. This was the only one of IJ Chase's reasons that the BIA expressly affirmed. The IJ found that this letter was fraudulent because of the implausibility that the local village government would admit to a forced abortion when the Chinese national government denies that such practices exist and because Huang could not "give any possible reason why such a document would be needed by anybody in China." Huang argues that this conclusion is based on speculation. The Government responds that the IJ could rely on the suspicious timing of the creation of the document (ten months after the abortion and two months after Huang filed for asylum) as well as its "inherent implausibility." However, in reaching his conclusion, the IJ mischaracterized Huang's testimony. As noted, Huang did give an explanation for why such a document would be needed in China, *i.e.,* to prove that his wife already had been punished for her violation and nothing more needed to be done. We express no opinion as to whether a reasonable fact-finder, after properly assessing the evidence and Huang's explanation, could reasonably find the document to be fraudulent.

*The village confrontation.* The IJ found Huang's account of the confrontation with

village authorities incredible because an "uneducated villager" would not refer to human rights in confronting local authorities. Although the line between reasonable inference-drawing and speculation is imprecise, this finding crosses the line however drawn. The IJ's speculation appears to have been influenced by his evident bias against Huang, explored more fully in Part VI, *infra*.

*Timing of the IUD insertion.* The IJ thought it improbable that Huang's wife would be too weak to undergo sterilization immediately following the forced abortion and faulted Huang for failing to provide medical documentation on this point. However, Huang's wife underwent a forced abortion in her final month of pregnancy, and nothing in the record supports the IJ's inexpert medical opinion that sterilization could have been promptly performed after the abortion.

*Huang's treatment of his daughter.* IJ Chase also found Huang incredible based on the fact that Huang and his wife gave up their first child for adoption because she was a girl. IJ Chase described this act as "sexist," "inhumane," and "selfish," and explained how it is antithetical to American society and values. None of the IJ's commentary bears upon Huang's truthfulness.

B. The BIA's Reasons

The BIA agreed with the IJ that the abortion document was not authentic, and provided three additional reasons for doubting Huang's credibility.

*Confusion over the timing of the abortion.* The BIA thought Huang was inconsistent in stating at one point that the abortion occurred in the ninth month of the pregnancy and at another point that it occurred one month before her due date. This discrepancy is too insignificant to warrant an adverse credibility finding, es-

pecially in view of Huang's explanation that he thought pregnancy lasted ten months. The BIA also seized on an apparent slip of the tongue when Huang stated that the abortion occurred "when she is five months old—nine months pregnant." Since the wife was obviously not five months old and the gender of the fetus had not been identified, the only reasonable interpretation of this passage is that the reference to "five months" was either a slip of the tongue by Huang as he began his answer or a transcription error by the stenographer. The IJ, who heard the testimony, did not identify the reference to five months as an inconsistency.

*Wife's occupation listed as farmer.* Huang stated in his asylum application that he and his wife lived in a non-agricultural area, but a hospital receipt listed his wife's occupation as a farmer. Huang explained the discrepancy by stating that they had formerly been farmers but that the government took their land for road construction. The BIA did not offer a "reasoned evaluation" of the petitioner's explanation, as we require, *see Cao He Lin v. U.S. DOJ*, 428 F.3d 391, 403 (2d Cir. 2005), and the IJ, apparently satisfied with the explanation, did not rely on this alleged discrepancy in making his adverse credibility finding.

*Confusing or nonresponsive testimony.* The BIA described Huang's testimony as "confusing and nonresponsive," citing most of his direct and cross-examination by the Government. To the contrary, a review of Huang's testimony reveals that he stood up admirably to the withering interrogation by the IJ. The BIA's conclusory statement does not support an adverse credibility finding, and the Government does not argue otherwise.

In sum, of the reasons noted by the IJ and the BIA for rejecting Huang's testi-

mony, only one—the dubious authenticity of the letter confirming the abortion—might support the adverse finding on credibility, and even that finding is tainted by the IJ's mischaracterization of Huang's explanation.

## IV. Appropriate Disposition in View of Errors

Although we may deny a petition despite errors where "we can state with confidence that the IJ would adhere to his decision were the petition remanded," *Xiao Ji Chen v. U.S. DOJ*, 434 F.3d 144, 161 (2d Cir.2006), we cannot deny relief on this record. Here, no "error-free portions" of the IJ's findings remain, and we therefore need not decide whether the IJ would reach the same conclusion notwithstanding the errors. *Cf. id.* at 162. As noted above, we do not decide whether a reasonable fact-finder could conclude that the local officials' abortion certificate was not authentic. Upon reconsideration, with the numerous erroneous grounds of decision disregarded, a fact-finder might accept Huang's argument that local officials would issue an authentic document at odds with the professed national policy, especially in view of Huang's other supporting documentary evidence, which included birth certificates, a marriage certificate, a document from the hospital, a pregnancy check-up card for Huang's wife, an ID card, a household member booklet, and a letter from his wife. The errors permeating the adverse credibility finding require a remand.

## V. The IJ's Apparent Bias and Hostility Toward Huang

Apart from the flaws in the adverse credibility finding, this is the rare case where remand is required because of the IJ's apparent bias and hostility toward Huang. The hearings included several instances of questioning by the IJ that were at least inappropriate and at worst indicative of bias against Chinese witnesses.

*IJ's insistence that Huang work.* At the initial hearing on September 8, 1999, IJ Chase asked Huang a few preliminary questions about whether he was working, ostensibly to determine a reliable address where Huang could be located. After Huang stated that he was not working, but owed relatives $40,000, which they did not expect him currently to repay, IJ Chase said:

> That is [the] most ridiculous thing I have ever heard. I am not going to take the asylum application now. We will have you come back every month. And eventually, you will have a job somewhere and [then we will] find out where you are working. In the meantime, no work permission, no hearing on your asylum application until I find out where you are working because obviously, you are either working somewhere or about to be working somewhere. And I am not going to waste my court time on this case. You have an obligation by law to inform us where you are living which would include a work address and where you are sleeping.

When Huang's lawyer pointed out that "by law, he can't look for a job," [3] IJ Chase replied "By law, you can't come to this country with a smuggler either.... But he's here." IJ Chase and Huang then had the following colloquy:

---

3. Huang's lawyer was correct. The regulations promulgated on March 6, 1997, *see* 62 Fed.Reg. 10,312, 10,340, 10,389, permit an alien who has filed an application for asylum to apply for employment authorization only after the expiration of 150 days from the filing of the asylum application. *See* 8 C.F.R. §§ 208.7(a)(1), 274a.12 (c)(8). Huang applied for asylum on Sept. 8, 1999.

Q. You don't even want a job.

A. Because I'm not allowed to work.

Q. That hasn't stopped a single person until now.

A. I don't have any type of paper or—

Q. That hasn't stopped anybody else. Everybody else has no papers and they are working in restaurants all over the country.

A. Well, I'm afraid to—that they will arrest me or detain me.

Q. Okay.

JUDGE FOR THE RECORD

October 15th at 9 o'clock.

JUDGE TO MR. [HUANG]

Q. We'll see if you have a job yet and where you are living and then we'll decide if we'll set the case for a hearing.

*IJ's concern that Huang lived in an Hispanic neighborhood.* At the second hearing, held on October 15, 1999, IJ Chase asked Huang for his address. After Huang stated that he was living on 105th Street, below Columbia University, the court clerk informed the IJ that this was an Hispanic neighborhood. The transcript quotes the clerk as referring to the area as "Alberio," which we will assume is a stenographer's mishearing or misspelling of "a barrio." The ensuing colloquy between the IJ and Huang included the following:

Q. How did you end up on 105th Street in [a barrio]?"

A. Because I've been living there with my relative since I've been here.

Q. What relative?

A. My female older cousin....

Q. Why does she live there?

A. She—when she emigrated to this country, she just live there.

Q. Well, for some reason, most of the people are living in Chinatown.

The IJ and the Court Clerk then discussed some other predominantly Chinese neighborhoods. IJ Chase then telephoned Huang's cousin and confirmed Huang's residence.

*IJ's skepticism about all Chinese witnesses.* At a hearing on the merits of Huang's petition, the following colloquy ensued:

Q. [by Huang's lawyer]: So, sir, why did you come to the United States?

A. [by Huang] Because I suffered persecution from the Chinese government.

Q. [By IJ] All right. Stop right there. Nobody talks like this. If you had a problem in China, you say I had a problem in China. Nobody says to me how was your day today and I say I was persecuted by the government on account of my whatever. People don't talk like that. Only people who are coached by snakeheads talk like that.

The IJ then launched into a diatribe against Chinese immigrants lying on the witness stand, spanning 12 pages of transcript. At one point, he described how, in his view, Chinese applicants would say one thing to each other "in a restaurant in Chinatown," but when they sat in the "magic chair" in the witness box, they would say that they were persecuted under the family planning policy. Eventually, Huang's counsel was permitted to resume his direct examination.

*IJ's disapproval of Huang's placing his daughter for adoption.* When Huang acknowledged on cross-examination that he and his wife had given their daughter up for adoption, IJ Chase interrupted and, in a colloquy that consumed 15 pages of transcript, berated Huang for agreeing to the adoption of a female child. Among IJ Chase's questions and statements were the following:

Q: So, your own culture is prejudice[d] against females.

Q: I have heard many stories of people throwing away the child.

Q: Are baby girls entitled to human rights?

Q: If she [Huang's daughter] came to you today[, and said] you have no human rights, you gave me away just because I was a girl, what would you answer to her?

Q: Is this about you or is this about your children's happiness?

Q: In this country, it's not about the parents. It's about the kids. Here it is we worry about their future and their happiness, not about our own. But it seems like you are more interested in your own comfort and well being than what happens to the child. A girl isn't entitled to have parents' love.

IJ Chase pressed Huang further on his conception of human rights, asking him to come up with his own way of solving China's population problem. Not surprisingly, Huang had no helpful solution.

*Appropriate disposition.* This is not the first case in which the conduct of IJ Chase has raised substantial questions as to his apparent bias against and hostility toward a petitioner. In *Meizi Liu v. BIA,* 167 Fed.Appx. 871 (2d Cir.2006) (summary order), the panel remanded partly because of IJ Chase's demonstrated "pervasive bias and hostility" toward the petitioner. *Id.* at 873. In *Hajderasi v. Gonzales,* 166 Fed.Appx. 580 (2d Cir.2006) (summary order), a different panel commented on IJ Chase as follows:

[W]e agree with the BIA that the IJ's tone was at times "inappropriately sarcastic".... We are troubled ... by his sarcastic tone and by his manner of questioning, which is easily perceived as badgering. Such behavior by a judge is rarely appropriate.

*Id.* at 582. In *You–Mei Ding v. CIS,* 140 Fed.Appx. 306 (2d Cir.2005) (summary order), another panel noted that the BIA had specifically disavowed inappropriate remarks made by IJ Chase. *Id.* at 307.

IJ Chase's hostility toward Huang and apparent bias against him and perhaps other Chinese asylum applicants is manifest on this record. The IJ berated Huang for not having employment despite Huang's valid explanation that he could not lawfully work, and refused to reach the merits of the asylum application until Huang found employment; the IJ questioned why Huang would live in a Hispanic neighborhood since "most of the people are living in Chinatown"; the IJ expressed the view that Chinese applicants consider the witness stand a "magic chair" from which they would change their story from what they would tell their friends in a "restaurant in Chinatown"; and the IJ chastised Huang for giving his daughter up for adoption and criticized Chinese rural attitudes that value sons more than daughters.

We assume that what occurred in the pending case and in the prior cases of *Meizi Liu, Hajderasi,* and *You–Mei Ding* are atypical departures from the type of hearings normally conducted by IJ Chase.[4] Nevertheless, the record of the hearings in the pending case demonstrates that remedial action is required. Where such displays of hostility and apparent bias have occurred, some courts have remanded for reconsideration before a different IJ, see *Mece v. Gonzales,* 415 F.3d 562, 578 (6th Cir.2005); *Fiadjoe v. Attorney General,* 411 F.3d 135, 163 (3d Cir.2005); *Nuru v.*

4. In another case, for example, a panel of this Court, in affirming a decision by IJ Chase, noted his "commendable efforts to corroborate [petitioners'] claim through the consu-late." *See Herath v. Gonzales,* 2006 WL 1675438, at *2 (2d Cir. June 12, 2006) (summary order).

*Gonzales,* 404 F.3d 1207, 1230 (9th Cir. 2005), while others have only recommended such reassignment, *see Cham v. Attorney General,* 445 F.3d 683, 694 (3d Cir.2006); *You Hao Yang v. BIA,* 440 F.3d 72, 76 (2d Cir.2006); *Paramasamy v. Ashcroft,* 295 F.3d 1047, 1055 n. 4 (9th Cir. 2002). Although supervisory authority over IJs is vested in the Attorney General, *see* 8 C.F.R. § 1.1(*l*) (2006), we believe that the authority of courts to review the decisions of officers exercising adjudicative functions includes the power to require reassignment when necessary to avoid repetition of a biased discharge of those functions or even to avoid the appearance of substantial injustice. We have asserted similar authority to require reassignment to a different district judge for retrial or resentencing, *see United States v. Robin,* 553 F.2d 8 (2d Cir.1977) (in banc), notwithstanding the normal authority of a district court to divide the business of the court among its judges, see 28 U.S.C. § 137.

In this case, in the event that the BIA, upon remand, determines that further consideration by an IJ is warranted, the matter shall be reassigned to a different IJ.

## Conclusion

The petition for review is granted, and the matter is remanded to the BIA for reconsideration consistent with this opinion and reassignment to a different IJ if the BIA determines that further consideration by an IJ is warranted.