Li  v. Holder

BIA
Nelson, IJ
A089 908 408

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 8th day of May, two thousand twelve.

PRESENT:
>JON O. NEWMAN,
>JOSÉ A. CABRANES,
>RAYMOND J. LOHIER, JR.,
>>_Circuit Judges._

_____

XIULIAN LI,
>_Petitioner,_

v.

ERIC H. HOLDER, JR., UNITED STATES
ATTORNEY GENERAL,
>_Respondent._

11-3050-ag
NAC

_____

FOR PETITIONER:        Nathan Weill, New York, N.Y.

FOR RESPONDENT:        Tony West, Assistant Attorney General; William C. Peachey, Assistant Director; Mona Maria Yousif, Attorney, Office of Immigration Litigation, United States Department of Justice, Washington, D.C.

UPON DUE CONSIDERATION of this petition for review of a Board of Immigration Appeals ("BIA") decision, it is hereby ORDERED, ADJUDGED, AND DECREED that the petition for review is GRANTED, and the matter is REMANDED for further proceedings.

Petitioner Xiulian Li, a native and citizen of the People's Republic of China, seeks review of a June 30, 2011, decision of the BIA affirming the May 21, 2009, decision of Immigration Judge ("IJ") Barbara A. Nelson denying her application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). *In re Xiulian Li*, No. A089 908 408 (B.I.A. June 30, 2011), aff'g No. A089 908 408 (Immig. Ct. N.Y. City May 21, 2009). We assume the parties' familiarity with the underlying facts and procedural history of the case.

Under the circumstances of this case, we have reviewed both the IJ's and the BIA's opinions. *See Jigme Wangchuck v. DHS*, 448 F.3d 524, 528 (2d Cir. 2006). The applicable standards of review are well established. *See* 8 U.S.C. § 1252(b)(4)(B); *see also Xiu Xia Lin v. Mukasey*, 534 F.3d 162, 165-66 (2d Cir. 2008).

For asylum applications, like Li's, governed by the REAL ID Act, the agency may, considering the totality of the

circumstances, base a credibility finding on an asylum applicant's demeanor, the plausibility of her account, and inconsistencies in her or her witness's statements, without regard to whether they go "to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii); *Xiu Xia Lin*, 534 F.3d at 163-64.

Li sought asylum on the ground that she had been subjected to two forced abortions. This claim, if true, would have entitled her to asylum. *See* 8 U.S.C. § 1101(a)(42)(B). The IJ made an adverse credibility finding, which was upheld by the BIA, on two grounds. First, the IJ concluded that Li's testimony evidenced lack of credibility. Second, the IJ was concerned that Li had omitted from her initial asylum application the fact that she had been discharged from government employment for violating the family planning policy. We consider each ground separately.

1. Li's testimony.

The IJ's adverse credibility finding was based significantly on two instances in which the IJ thought that Li's responses went beyond the scope of the questions and admonished her for doing so. The first instance occurred when Li was asked the somewhat open-ended question concerning why,

at age 22, she was considered too young to lawfully bear a child.  The following colloquy ensured:

Q. [by Li's counsel] Why were you too young?
A. According to the local government, there was a regulation that you must be 24 and half years old and also a policy of late birth.  And as long as you meet that standard, then you have to get a birth permit in order to have a child.  At that time I just did not know anything. When I went to register the marriage, none of the departments over there told me anything.

JUDGE TO MS. LI
Q. Ma'am, I think you're going way beyond the question that was asked. Please answer only what your attorney asks you.
A. Yes.

In fact, Li's response endeavored to answer the question and added only why she was unable to provide more information to respond to the "why" question.  No admonition was called for.

The second instance occurred when Li was questioned about her second forced abortion.  The following colloquy ensured:

Q. [by counsel] What did they do?
A. They forced me up -- they forced me into an operating room. I kept screaming very loudly and I said, please let me go, but no matter how I struggled physically or screaming, it, it had no use.  Two nurses held me up to the operating table by my shoulders so I could not move.  And then the doctor forcibly performed a D&C procedure on me. No anesthetic was injected.  I felt like -- that my -- someone had pulled out my intestine.

JUDGE TO MS. LI

Q.    All right, ma'am, again you're going beyond the question that was asked. This isn't supposed to be an open-ended narrative. Your attorney has done lots of this kind of case and he knows what questions to ask to get the information that he needs from you. So, if you would be patient and let him ask the question instead of just trying to tell your story in one felled [sic] swoop.

Li's answer was entirely appropriate to the open-ended question, "What did they do?"  The IJ's admonition was unwarranted.

Had these admonitions not affected the IJ's assessment of Li's credibility, we would not be overly concerned.  However, our concern increases when we see the following passage in the IJ's oral decision:

[T]he Court finds that there are some troubling aspects regarding the respondent's demeanor. During her testimony, partic ularly during direct examination, the respondent would be asked a simple question and would give an extremely long narrative. In fact, it appeared to the Court that the respondent was giving a speech. The speeches would go on way beyond what the question asked for.

The two colloquies we have recounted are the only instances in Li's examination where the IJ indicated that a response exceeded the scope of the question.

Our concern is further heightened by the BIA's reasons for affirming the IJ's adverse credibility finding: "In making an

adverse credibility determination, the Immigration Judge found*, inter alia*, that the respondent appeared to have rehearsed her testimony and was hesitant and unresponsive in certain points in her testimony. The Immigration Judge's finding is supported by the record (*see*, *e.g.*, Tr. at 11-16, 18, 26, 29-31, 33, 35)."

We have examined each cited transcript reference and note the following. Within the first reference (pages 11-16) there is nothing on pages 11, 12, or 15 that supports the BIA's characterization. The only passage to which the BIA could be referring on page 13 is Li's response to the question as to why she was considered too young to lawfully bear a child, a response that, as we have pointed out, was not inappropriate. The only passage to which the BIA could be referring on page 14 is Li's response to how the second abortion was performed, which was entirely appropriate. The only passage to which the Board could have been referring on page 16 is the following colloquy:

> Q. Do you know why they [the Chinese authorities] changed the form of contraception?
> A. I don't understand the question.
> Q. Well, you had been taken birth control pills according to your application. Then you stopped taking them, got pregnant and had your son. After that, you were -- after that, you had an IUD. Do you know why they changed the form of contraception that you were using?

A. At the time when I got married, I did not know about the regulations that would prevent me to have children and did not take any birth control measures, so other --
Q. I'm not, I'm not talking about before you were on contraception. My question is about why did they change the form of contraception?
A. After I gave birth to this child, child, it was the regulation that half of year after their birth must wear an IUD.

Although Li initially said she did not understand the question, that was not an inappropriate response to a question that she was not competent to answer. Nevertheless, she responded within the limits of her knowledge.

On pages 18 and 26, there is nothing that supports the BIA's characterization. With respect to pages 29-31, the only passage that might arguably have concerned the IJ and therefore the BIA was one response on page 31 in which Li said she did not understand the question. On page 33, the following colloquy apparently troubled the IJ:

Q. [by DHS counsel] Do you have any proof that you attend the church here in the United States?
A. I go to church every Sunday, in the morning.
Q. No, but do --
JUDGE TO MS. LI
Q. Ma'am, that's not the question. The question is do you have any evidence to show that you, in fact, do that?
A. I don't have it because I haven't been baptized.

Although a simple "no" would have been the better response, Li's two answers would seem to merit little, if any,

-7-

criticism.  The last page of transcript cited by the BIA, page

35,  contains the following colloquy:

> JUDGE TO MS. LI
> Q. When did you first attend church in the U.S.?
> A. I even went last Sunday.  When I came this morning
> the person was in charge in our church prayed for me.
> Q. All right, ma'am, perhaps you didn't understand
> the question.  When was the first time you attended
> a church in the United States?
> A. First time? December -- I went in December 2007.
> Q. How long has your mother been a practicing
> Christian?
> A. My mother?
> Q. Yes, your mother.
> A. I -- I'm not sure when she joined the religion
> because my work was very, very busy and I accompanied
> her because she was in her 80s.
> Q. Ma'am, just answer the question I asked. As far as
> you know, when you were a child, did your mother
> practice Christianity?
> A. She hasn't practiced Christianity for not too
> long. She hasn't practiced Christianity for too long.

The IJ's first question was not answered until the second

response, but the IJ's remaining questions were answered

directly, even though the IJ changed the question after

admonishing Li to "just answer the question I asked."

We understand the difficult task that IJs have in

determining the credibility of asylum applicants, at least

some of whom are undoubtedly giving false testimony supplied

to them by the smugglers who arranged for their unlawful

entry.  We also recognize that the IJ has the opportunity to

observe the applicant and to assess her demeanor. *See Lin v.*

*Gonzales,* 446 F.3d 395 (2d Cir. 2006).  At the same time, we

-8-

have an obligation to make sure that the questioning of an applicant is fair and that unwarranted criticisms of legitimate responses do not create an unacceptable risk of a flawed assessment of credibility. *See Huang v. Gonzales*, 453 F.3d 142, 148-50 (2d Cir. 2006). From the colloquies we have recounted, we conclude that that risk is present in this case.

One further excerpt from the testimony also suggests that the IJ might have permitted inappropriate questioning to color her credibility assessment. The following colloquy concerned Li's account of her second forced abortion:

    Q. [By Li's counsel] Can you describe it, please?
    A. They did not inject me any anesthetic, the same as
    the first time. It felt like someone pulled out my
    intestine. Over there every, every cut I was made and
    I felt like -- so painful that I felt like I was
    dying.
    JUDGE TO MS. LI
    Q. I'm sorry, what cuts were made?
    A. It, it felt like -- my feeling was like they were
    making cuts, that's how I felt.
    Q. Was -- did this abortion feel different than the
    first one?
    A. It was also D&C procedure, the same feeling as the
    first time.
    Q. Did they make any cuts or did it just feel like
    they were making cuts?
    A. The doctor -- the nurses were there and when they
    were doing it, it felt like scraping and cutting.

Why a woman who had undergone a forced abortion without anesthetic would be pressed to answer the question "Did they make any cuts or did it just feel like they were making cuts?" is not readily apparent.

-9-

2. Omission of Li's discharge from employment.

As the IJ and the BIA noted, Li's initial asylum application recited her two forced abortions but did not mention that she was discharged from government employment for violating the family planning policy. Li testified that she understood that the forced abortions were evidence of persecution, but that she did not think that being fired from employment added anything to her claim. She also explained that after her lawyer told her that the firing was relevant to her claim, she amended her application to include the employment discharge.

Although an omission can have a bearing on an applicant's credibility, *see* 8 U.S.C. § 1158(b)(1)(B)(iii) (providing that agency may base credibility determination on inconsistencies between applicants statements, and "the consistency of such statements with other evidence of record"), the IJ initially commented on Li's omission in a sympathetic manner:

> The respondent mentioned nothing about this in her written application for asylum, only that she was dismissed from her employer. If this were the only omission or inconsistency, the Court might find that it had been inadvertent, and the respondent had not offered it because she might not have considered it the worst form of persecution. One could easily understand that a respondent would find an abortion to be a far more serious form of persecution than loss of employment.
> However, a loss of employment is hardly something to be forgotten or easily dismissed from memory, but there are other reasons that the Court

-10-

has trouble with this serious omission. The respondent's husband sent a letter to corroborate her claim. He mentions absolutely nothing about her losing her position in August of 2006, and, of course, mentions nothing about her attempts to [be] reinstated. Her neighbor also does not mention it, which is troubling because the neighbor does seem to know a great deal about the respondent, including her pregnancies, her abortions, et cetera. Even more disturbing is the fact that the respondent's co-worker did not mention in his or her letter that she was dismissed from their place of employment.

Given these factors, the Court finds that the omission is more troubling on several levels, including the fact that it appears to the Court that perhaps the content of the letters was directed by the respondent when she initially filed her application for asylum. The Court also notes that in another continuation sheet, which contains simply the dates (places of employment for the respondent could not be fit on the 1-589), it indicates that her employment with that particular place ended in May of 2006. But when one considers all these factors together, this is a serious omission, and the Court finds that it is sufficient to find that her testimony is not credible.

We are unable to follow the IJ's logic. If it was understandable that Li would regard the discharge as insufficient to augment her claim based on two forced abortions, it is difficult to understand why the same omission becomes more significant when it is made by her husband or others supporting her application.

In sum, we are left with sufficient doubt about the fairness of the adverse credibility finding to warrant a remand so that Li's testimony may be assessed without the troubling matters we have identified. Although we have no

-11-

doubt that the IJ could conscientiously make a new assessment based on the existing record, we think the appearance of justice is better served by requiring a different IJ to conduct a renewed hearing on remand. *See Huang*, 453 F.3d at 150.

For the foregoing reasons, the petition for review is GRANTED, and the matter is REMANDED for further proceedings consistent with this order.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk