Lin v. Lynch

BIA
Zagzoug, IJ
A096 132 956

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.  CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1.  WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER").  A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 4th day of August, two thousand sixteen.

PRESENT:
JON O. NEWMAN,
DENNIS JACOBS,
RAYMOND J. LOHIER, JR.,
     *Circuit Judges.*

_____

FENG YUE LIN,
     *Petitioner,*

v.                                              15-377
                                                NAC

LORETTA E. LYNCH, UNITED STATES
ATTORNEY GENERAL,
     *Respondent.*

_____

FOR PETITIONERS:        Gary J. Yerman, New York, NY.

FOR RESPONDENT:         Benjamin C. Mizer, Principal Deputy Assistant Attorney General; Nancy Friedman, Senior Litigation Counsel; Sharon M. Clay, Trial Attorney, Office of Immigration Litigation, United States Department of Justice, Washington, DC.

UPON DUE CONSIDERATION of this petition for review of a Board of Immigration Appeals ("BIA") decision, it is hereby ORDERED, ADJUDGED, AND DECREED that the petition for review is GRANTED, and the matter is REMANDED.

Petitioner Feng Yue Lin, a native and citizen of the People's Republic of China, seeks review of a January 23, 2015, decision of the BIA, affirming an October 23, 2012, decision of an Immigration Judge ("IJ") denying asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). *In re Feng Yue Lin,* No. A096 132 956 (B.I.A. Jan. 23, 2015), *aff'g* No. A096 132 956 (Immig. Ct. N.Y. City Oct. 23, 2012). We assume the parties' familiarity with the underlying facts and procedural history in this case.

Under the circumstances of this case, we review the IJ's decision as modified by the BIA. *Xue Hong Yang v. U.S. Dep't of Justice*, 426 F.3d 520, 522 (2d Cir. 2005). The applicable standards of review are well established. 8 U.S.C. § 1252(b)(4)(B); *Xiu Xia Lin v. Mukasey*, 534 F.3d 162, 165-66 (2d Cir. 2008).

The agency may, "[c]onsidering the totality of the circumstances," base a credibility finding on an asylum applicant's demeanor, the plausibility of her account, and inconsistencies in her statements and other record evidence

2

"without regard to whether" they go "to the heart of the applicant's claim."  8 U.S.C. § 1158(b)(1)(B)(iii); *Xiu Xia Lin*, 534 F.3d at 163-64.  Although the record reveals minor instances of inconsistencies in the Petitioner's testimony, some of the IJ's findings are not inconsistencies, some are not supported by the record, some involve unwarranted speculation, and some aspects of the IJ's and the BIA's comments warrant further explanation.  In combination these deficiencies require a remand.

The IJ expressed concern about the medical certificate from the hospital where the alleged abortion was performed.  The IJ referred to the Department of State profile, which she said, "indicates that documents issued upon patient's request indicate a voluntary abortion and not passed out [*sic*] on the involuntary nature of the procedure . . . ." ROA 68.  There is no evidence that the certificate was issued at Lin's request.  When asked, "Why did you get this record?" Lin answered, "When I left the hospital, doctor gave it to me." ROA 122.  She was then asked, "What were you, what was it for, do you know?" and answered, "I don't know, he gave it to me." *Id.*  The IJ gave no explanation as to why the Department of State profile concerning requested documents cast doubt on the testimony of a witness who did not make a request.  The IJ stated  that Lin's "acquisition of an

abortion record without even asking for it is suspect." ROA 67-68. The IJ did not explain the basis for her speculation that Lin's acquisition of the certificate without asking for it was "suspect."

The IJ expressed concern that the certificate (Exhibit C, ROA 251-52) indicates that it is an "out-patient history," whereas Lin testified that she stayed one night at the hospital (ROA 121). The certificate indicates a "Primary outpatient date" of December 20, 2010. There is no explanation of why the date is called "[p]rimary." The IJ doubted Lin's testimony that she stayed in the hospital one night and that her mother, who took her home the second day, came to visit her the first day. The IJ considered Lin's testimony "not consistent with her mother's letter" (Exhibit J, ROA 292), "which does not mention an overnight stay." ROA 67. There is no inconsistency. The mother's first day visit was not such a significant event that it would normally be expected to be mentioned in a letter informing the IJ about her daughter's forced abortion. Moreover, the letter states, "When I arrived in the hospital, they already gave my daughter an injection to have an induced abortion," (Exhibit J, ROA 292), which can be fairly read to mean that the mother visited shortly after the abortion occurred.

The IJ also noted what she considered inconsistencies in

4

Lin's testimony about her uncle, Michael Lam, and between her uncle's testimony and hers. The IJ recounted Lin's testimony about the day her uncle visited her home in China: "she spent time with him"; "she did not really talk to him"; she "changed her testimony from only seeing him to have [*sic*] a conversation with him about needing help when she gets to the United States." ROA 53. The IJ characterized Lin's demeanor during this portion of her testimony as "very confused," noting that "[h]er brows were furrowed." *Id.* The uncle testified that on that day "She just mentioned she wants to go to United States" and "I mention I can help her find a job or something, but nothing else." (ROA 146-47). If these fragments show an inconsistency at all, it is trivial, and it is not clear how furrowed brows render demeanor "very confused."

The IJ noted Lin's initial testimony that she "heard" her father and her uncle, Michael Lam, talking that day. ROA 54. And, the IJ continued, Lin "indicated, changing her testimony again, that she did not actually hear the conversation, that her father told her later on that he told him [about the abortion]." *Id*. Lin explained, "What I meant was, I heard from my father. He told me he already tell uncle about it." ROA 133. Whether Lin overheard her father's report to her uncle or heard the father's account of the conversation directly from him is

5

of trivial, if any, significance. Although inconsistencies need not go to the heart of an applicant's claim, they must have at least minimal significance.

The IJ noted the uncle's testimony that he and Lin "had dinner together once or twice every couple of weeks" and then "changed his testimony to say that they see each other whenever he has time." ROA 64. These fragments do not reveal that the uncle's testimony "changed."

The IJ characterized Lin's testimony as stating that "after their initial meeting in the United States, she saw . . . Michael Lam . . . only when he appeared in Immigration Court to testify on her behalf," referring to the court hearings on April 6, August 31, and October 2, 2012. ROA 64. This characterization was inaccurate. The IJ apparently was referring to a question to Lin on cross examination: "The only time you see your uncle is in connection with this case?" ROA 141. Lin answered, "No, everyday life, too." *Id.* Lin also testified, "We often came out and see each other." ROA 140. Lam testified that he and Lin saw each other in the United States "[s]ometimes. When I have time I go." ROA 149.

The IJ doubted Lin's credibility because she did not know the name of Lam's wife, apparently meaning her first name. Lin testified that "[w]e only call [her] auntie." ROA 136. There

6

was no reason to doubt that Lin did not know the first name of the uncle's wife. The wife and the uncle are apparently estranged; the uncle testified that he lives in Chinatown, and the wife lives on Long Island. ROA 147. He also testified that Lin had never met his wife. *Id.* The IJ also stated, "[Lin's] excuse that she is not close to [Lam's] children because they were in the United States for a long time and they are between 30 and 40 years old does not make any sense, because she is approximately 34 years old and would be in the same range as his children." ROA 65. This mischaracterizes her testimony. Lin never testified that she was not close to the uncle's children because they were between 30 and 40 years old. She was asked whether she knew their ages and answered "30-something, 40-something?" and "I don't know." ROA 136. When asked, "You don't know the names of his kids?" she answered, "Because they left the country early." *Id.*

In sum, the IJ's basis for doubting Lin's credibility on the serious matter of whether her undisputed abortion was voluntary or forced is undermined by mischaracterizations of the record and assertions of some inconsistencies that do not exist and some that are trivial. A remand to develop a more reliable basis for determining Lin's credibility is required. Because the IJ has already come to a conclusion that Lin was

not credible, we will direct that, on remand, the new hearing occur before a different IJ to avoid the risk that the IJ who conducted the first hearing might not be able to put aside her initial conclusion. *See Guo-Le Huang v.* Gonzales, 453 F.3d 142, 151 (2d Cir. 2006) (recognizing power of courts to require reassignment to avoid appearance of impartiality).

For the foregoing reasons, the petition for review is GRANTED, and the matter is REMANDED for a new hearing consistent with this order.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk