In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 06-1333

DANUT FLOROIU, ALINA FLOROIU,
and DANIA FLOROIU,

*Petitioners,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
Nos. A95-920-814, A95-920-813, and A95-920-815.

_____

ARGUED JANUARY 24, 2007—DECIDED APRIL 2, 2007

_____

Before RIPPLE, ROVNER and WILLIAMS, *Circuit Judges.*

PER CURIAM.    Danut and Alina Floroiu, Seventh-day
Adventists from Romania who are married, along with
their daughter, Dania, petition for review of an order of
the Board of Immigration Appeals ("BIA" or "Board")
denying their applications for asylum, withholding of
removal, and relief under the Convention Against Torture
("CAT"). Following a removal hearing, an Immigration
Judge ("IJ") denied their requests for relief on grounds
that an asylum application was untimely and that, with

respect to their applications for withholding of removal
and relief under CAT, the Floroius failed to sustain their
burden of showing it was more likely than not that, if
returned to Romania, they would suffer persecution or
torture because of their religion. The BIA affirmed. The
Floroius now petition for review of only the denial of their
application for withholding of removal. Because the IJ
manifested a clear bias against the Floroius, which de-
prived them of their right to a fair hearing, we grant their
petition for review.

**1.**

Danut and Alina Floroiu entered the United States in
February 2000 as non-immigrant visitors. After an attempt
to have their five-year-old daughter, Dania, enter the
United States in January 2003, the Immigration and Natu-
ralization Service initiated removal proceedings against
all three family members. *See* 8 U.S.C. §§ 1182(a)(7)(A)(i)(I),
1227(a)(1)(A) & 1227(a)(1)(B).

At the hearing before the IJ, the Floroius conceded
removability but requested asylum, claiming religious
persecution. In support of their claim, Mr. Floroiu testified
that, on four separate occasions between 1997 and 2000,
he had been prevented from preaching his faith and
distributing Seventh-day Adventist literature with mem-
bers of his youth group. The first incident occurred in the
city of Bicaz in 1997, when a local Romanian Orthodox
priest told them to go home and not return to the town. The
second incident occurred in Girov in 1998, when Mr.
Floroiu and the youth group attempted to distribute
religious literature door-to-door, and another Orthodox
priest told them to leave the city. Mr. Floroiu reported this

to the police, who said they could not do anything because the Orthodox Church is supported by the majority of the people. The third incident, also in 1998, occurred in the city of Cuiejdi. As before, a local Orthodox priest told Mr. Floroiu and his group to stop handing out the litera-ture. A verbal altercation ensued, and people from the village joined in and threatened to kill Mr. Floroiu and other members of his group.

The fourth and most heated incident occurred in 2000 in Piatra Neamt Darmantspi, when a priest again in-structed Mr. Floroiu and his group to stop proselytizing and get out of the town. This confrontation escalated into a physical fight between Mr. Floroiu and the priest while a crowd gathered round; the priest threatened to kill Mr. Floroiu but did not injure him. One of Mr. Floroiu's friends witnessed this event and called the police, who brought Mr. Floroiu into the station and questioned him about the situation leading to the fight. After a few hours, the police released Mr. Floroiu, advised him not to return to the neighborhood, and warned him that the police would not be available to protect him in the event of any future conflict.

The Floroius testified that they had reason to fear future persecution if returned to Romania. Mr. Floroiu claimed that, since early 2000, there has been a warrant out for his "preventative arrest" in Romania, naming as his offense the distribution of religious literature. A.R. at 263-68; *see also id.* at 152-53. Mr. Floroiu also said that friends and family members have warned them not to come back because they would face further persecution. Letters from family and friends in Romania corroborating the Floroius' testimony were provided to the IJ. Mr. and Ms. Floroiu also testified that in Romania people work and children go

to school on Saturdays, which violates Seventh-day Adventist teachings. Other than confirming that they continue to practice Seventh-day Adventism in the United States, the Floroius did not discuss any details of how they now practice their religion in this Country.

The Government presented the State Department's country reports and reports on international religious freedom for Romania. These reports indicated that Romania's constitution provides for freedom of religion and that the government officially recognizes seventeen religions, including the Seventh-day Adventist Church. The reports note that, although the government generally respects religious rights, there are some exceptions. The reports indicate that, "[a]lthough protected by law, several minority religious groups, which include both recognized and unrecognized religions, made credible complaints that low-level government officials and Romanian Orthodox clergy impeded their efforts to proselytize, interfered in religious activities, and otherwise discriminated against them." A.R. at 250. The report goes on to acknowledge that, in some instances, "local police and administrative authorities tacitly supported societal campaigns (some of which were violent) against proselytizing," even though there is no law against proselytizing. *Id.* The reports detail various attacks on Adventist churches and prayer groups. Finally, the reports observe, recognized religions have the right to teach religion in public schools, however, Seventh-day Adventists have complained credibly that they were unable to hold classes in their faith and that their children have been compelled to attend Orthodox religion classes.

The IJ found the Floroius ineligible for asylum because they had filed their application three years after they

entered the Country, well past the one-year statutory deadline. *See* 8 U.S.C. § 1158(a)(2)(B). The IJ denied their claims for withholding of removal and relief under the CAT—claims that are not subject to the one-year time bar—because he determined that the past harm suffered by the Floroius did not rise to the level of persecution and that they had not established a likelihood of their being persecuted or tortured if returned to Romania. He relied on those portions of the State Department's country reports indicating that Seventh-day Adventists "are allowed to practice their religion in Romania and that the Romanian government has followed the legal protections for free expression of religion in practice and that Seventh-[d]ay Adventists are recognized as one of the religions who are [*sic*] allowed to register in Romania." A.R. at 84. The IJ found "that the respondents' claim such as it is is greatly exaggerated that [*sic*] the events on which they base their claim were partly the result of their own actions." A.R. at 83. The IJ's reasoning concluded with the following language in which he described the Floroius' practice of religion as offensive both in this Country and Romania:

> My observation of the respondents and their behavior in Romania and in the United States indicates to me that they are essentially zealots, that is people who practice their religion in a way which is very often offensive to the majority and that they have deliberately forced their religious expression on that majority in situations in which they have reason to know that that [*sic*] the manner of that expression would provoke an adverse reaction from the majority. This is not to condone any religious intolerance on the part of Romanian Orthodox believers, but it is to say that the respondents are not mere victims because of their

Adventist faith but rather to a degree contributorily negligent for acting in a way so as to provoke people who they know or should have reason to know would be offended by their aggressive proselytizing.

A.R. at 84-85.

The BIA dismissed the Floroius' appeal. First, the Board noted that the Floroius did not challenge the one-year filing deadline for asylum applications, and added that no exceptions to that deadline were present. The Board then denied the Floroius' applications for withholding of removal and for CAT relief. In reaching this determination, the Board acknowledged the observation in the country reports that the Romanian Orthodox Church had shown some hostility toward minority religious groups, but explained that the Floroius had not shown that their mistreatment rose to the level of persecution or that they had a well-founded fear of future persecution. Finally, the Board noted that "although the Immigration Judge inappropriately described the respondents as religious zealots, we find that he adhered to the role of impartiality assigned to him as one acting in a judicial or quasi-judicial capacity, and that the factual errors contained in his decision are harmless as they do not alter our ultimate decision." A.R. at 41 (citation omitted).

The Floroius filed with this court a timely petition for review of the BIA's decision and on the same day filed a "motion to reopen/reconsider" with the BIA. A.R. at 12. In the latter motion, the Floroius argued that the IJ did not adequately consider their claims of persecution, and they submitted purportedly new evidence that included a newspaper article from 2000 translated from Romanian into English entitled "The Adventists have yet to suffer if they want to grow!" and a second copy of the 2000 arrest

warrant for Mr. Floroiu. A.R. at 31-37. The BIA denied this motion, finding that the proffered evidence was not previously unavailable, as required for reopening, *see* 8 C.F.R. § 1003.2(c)(1), and that the Floroius presented no new legal argument to justify reconsideration, *see id.* § 1003.2(b)(1). The Floroius do not challenge that decision.

**2.**

In the present petition for review of the BIA's original decision affirming the denial of asylum and ordering removal, the Floroius focus on the IJ's mischaracterization of them in his decision as "offensive" religious "zealots" in both this Country and in Romania. They contend that they were denied a full and fair hearing because the IJ's view about their religious practices prevented him from giving due consideration to the evidence of persecution that they presented as well as corroborative evidence of persecution in the State Department's country reports.

We agree with the Floroius that the IJ departed from the judicial role and manifested a clear bias against them constituting a denial of due process. We cannot rely on the BIA's review of this matter because we believe that, as a matter of law, the BIA was wrong in its conclusion that the IJ had not departed from his judicial role.

It is well-established that, if an applicant in an immigration court has not received a meaningful opportunity to be heard, she has been denied due process, and we must grant her petition and remand for further proceedings. *See Giday v. Gonzales*, 434 F.3d 543, 547-48 (7th Cir. 2006); *Kerciku v. INS*, 314 F.3d 913, 917-18 (7th Cir. 2003); *Roman v. INS*, 233 F.3d 1027, 1032-33 (7th Cir. 2000). To obtain

relief, the petitioner must produce some evidence indicating that the denial of due process "actually had the potential for affecting the outcome" of the proceedings. *Kuciemba v. INS*, 92 F.3d 496, 501 (7th Cir. 1996) (emphasis in original).

These procedural rights have been codified. Under the applicable statutory and regulatory provisions, a lawful removal proceeding is one in which "[t]he immigration judge shall receive and consider material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing," 8 C.F.R. § 1240.1(c), and "the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government," 8 U.S.C. § 1229a(b)(4)(B); *see also Podio v. INS*, 153 F.3d 506, 509-11 (7th Cir. 1998). Our task is to determine "whether, given the totality of the circumstances, the petitioner[s] had a full and fair opportunity to put on [their] case." *Giday*, 434 F.3d at 548 (quoting *Rodriguez Galicia v. Gonzales*, 422 F.3d 529, 538 (7th Cir. 2005)). The BIA's conclusion that the IJ did not violate due process is a conclusion of law which we review de novo. *Chakir v. Gonzales*, 466 F.3d 563, 566 (7th Cir. 2006).

The IJ's decision reveals that the Floroius were denied the "reasonable opportunity" mandated by § 1229a. Without any reasoning, the IJ labeled the Floroius as religious "zealots" whose exercise of religion was "offensive to a majority." Because there was no explanation for that conclusion, these words betray a predisposition against the petitioners based on their religious practices. The bias reflected in the use of this language of intolerance taints the proceedings, erodes the appearance of fairness and creates substantial uncertainty as to whether the record below

was fairly and reliably developed. *See Islam v. Gonzales*, 469 F.3d 53, 55-56 (2d Cir. 2006). We find it ironic that the IJ—who is charged with protecting asylum applicants from religious persecution in their countries of origin—spoke in the unacceptable language of religious intolerance. *See Huang v. Gonzales*, 403 F.3d 945, 948-50 (7th Cir. 2005) (vacating because the IJ's extensive questioning about the applicant's Catholic beliefs and practices, based on his own assumptions and with no basis in the record, may have tainted his analysis of her credibility).

Our conviction that this language evinces bias sufficient to have denied the petitioners due process is strengthened by the flatly illogical conclusion about asylum law that the IJ had drawn. In his view, because the Floroius espoused a minority religious belief and because they felt compelled by their faith to evangelize in a way their country's religious majority disapproved of, they were "contributorily negligent," A.R. at 84, for any harm they suffered and could not be heard to complain or seek protection in the United States. This turns the protection of asylum on its head. Virtually every asylum seeker "provoke[s]," *id.*, his persecutors by having some immutable characteristic that another group finds offensive. When that provocation is based on "race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42)(A), our asylum laws support and protect the persecuted. *See* 8 U.S.C. § 1158(b)(1)(A).

Although we have no occasion to determine whether the Floroius were persecuted in fact or have established that it is more likely than not that they will be persecuted on their return, we note that the strength of the Floroius' religious belief and the fact that their practice in this be-

lief was unacceptable within the religious traditions of their community would be a reason to provide protection, not a justification for denying it.

We have not previously had an opportunity to decide whether it is appropriate to vacate the decision of an IJ where a denial of due process is based on an IJ's bias that is apparent, as it is here, from the face of the record. Based on the sound reasoning of our sister circuits that have vacated IJ decisions due to such apparent bias, we join those circuits and do so here.[1]

---

[1]  *See Islam v. Gonzales*, 469 F.3d 53, 55 (2d Cir. 2006) ("[W]hen an IJ's conduct results in the appearance of bias or hostility such that we cannot conduct a meaningful review of the decision below, we remand."); *Huang v. Gonzales*, 453 F.3d 142, 148 (2d Cir. 2006) (ordering remand "because of the IJ's apparent bias and hostility toward" petitioner); *Cham v. Attorney General of the United States*, 445 F.3d 683, 691 (3d Cir. 2006) (vacating where the IJ's language made it "crystal clear that [he] presumed [petitioner's] application to be without merit before even a shred of testimony had been presented, and treated [him] accordingly"); *Sukwanputra v. Gonzales*, 434 F.3d 627, 638 (3d Cir. 2006) (vacating in part because of the IJ's "bias-laden remarks" which had no basis in the record); *Wang v. Attorney General of the United States*, 423 F.3d 260, 269 (3d Cir. 2005) (vacating because of the IJ's manifest hostility and stating that "the mere appearance of bias on [the IJ's] part could still diminish the stature of the judicial process she represents") (internal quotation marks omitted); *Lopez-Umanzor v. Gonzales*, 405 F.3d 1049, 1050 (9th Cir. 2005) (vacating where the IJ's personal conjecture about domestic violence was indicative of bias and stereotypical assumptions); *Ahmed v. Gonzales*, 398 F.3d 722, 724 (6th Cir. 2005) (vacating where the IJ's "persistent mischaracterization of the [petitioners'] testimony biased his decision against them");

(continued...)

The IJ's decision is unsustainable for an additional reason: his finding that the Floroius' religious behavior "in the United States" is "offensive to the majority" has no basis in the record. A.R. at 84. We shall not uphold a factual determination that lacks record evidence. *See Guchshenkov v. Ashcroft*, 366 F.3d 554, 557-58 (7th Cir. 2004); *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000). In this case, Mr. Floroiu's only testimony regarding his time in the United States was in response to questions about how long he stayed in the United States during trips he made prior to his arrival in 2000. Mr. Floroiu provided no testimony at all about his religious activities in the United States or about any other activities since he has been here. Ms. Floroiu testified briefly that the family now belongs to a Seventh-day Adventist church in Chicago, but did not provide any information about her church activities or other aspects of her life in the United States. There is therefore no basis for the IJ's conclusion that the Floroius' behavior in the United States is "offensive to the majority."

In addition, we cannot sustain the IJ's decision because he failed to give due consideration to the evidence favoring the Floroius. We uphold the IJ's findings of fact "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). "To earn such deference, however, the IJ must announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely

---

[1] (...continued)
*Reyes-Melendez v. INS*, 342 F.3d 1001, 1002 (9th Cir. 2003) (vacating because the IJ's hostile comments and bias indicated that petitioner was denied a full and fair hearing).

reacted." *Sosnovskaia v. Gonzales*, 421 F.3d 589, 592 (7th Cir. 2005) (internal quotation marks omitted).

The IJ did not consider and analyze adequately the issues and substantial factual contentions raised before him. The IJ's ruling made no reference to the arrest warrant, to the Floroius' testimony that the police said they would not protect them, to the letters from family and friends in Romania warning that it would not be safe for the Floroius to return, or to newspaper articles documenting recent attacks on Seventh-day Adventist churches. *See Guchshenkov*, 366 F.3d at 557 (vacating where IJ's analysis of the evidence was "hopelessly incomplete"); *Niam v. Ashcroft*, 354 F.3d 652, 655 (7th Cir. 2004) (vacating because the IJ's "analysis flatly failed to engage with the evidence presented to him"). Instead, the IJ appears to have treated the country reports submitted by the Government as irrebuttably dispositive, contrary to our admonitions regarding the potential for bias in such reports and "the inability of asylum-seekers to question the conclusions contained therein." *Sosnovskaia*, 421 F.3d at 593-94; *Diallo v. Ashcroft*, 381 F.3d 687, 700 (7th Cir. 2004); *see also Niam*, 354 F.3d at 658-59; *Galina v. INS*, 213 F.3d 955, 958-59 (7th Cir. 2000). Moreover, the IJ disregarded evidence in reports that corroborates the Floroius' testimony, including documented violent attacks on Seventh-day Adventist groups by lower-level government officials and Romanian Orthodox clergy.

The IJ's handling of this case denied the Floroius' right to be heard. Regardless of the strength of their case on the merits, fundamental tenets of proper administrative procedure demand that the Floroius be granted a fair hearing in which the judge gives due consideration to their arguments without devaluing their case based on their

lawful exercise of religion. Because they have not received a fair hearing, and the findings are not supported by the evidence in the record, we must vacate the IJ's ruling and remand for further proceedings. *See Sosnovskaia*, 421 F.3d at 590 (vacating because the IJ failed to give due consideration to evidence favoring the petitioner); *Mansour*, 230 F.3d at 908 (vacating because the BIA's mislabeling of an applicant's ethnic and religious affiliation called into question the logic of the ruling); *Chitay-Pirir v. INS*, 169 F.3d 1079, 1081 (7th Cir. 1999) (vacating because it was "impossible to be confident that [the petitioner's] claim [had] been fully understood or analyzed"); *Hengan v. INS*, 79 F.3d 60, 63-64 (7th Cir. 1996) (vacating, despite the presence of evidence in favor of the Agency that would "ordinarily . . . lead[] a reviewing court to affirm," on the grounds that the IJ took into account irrelevant facts and did not properly consider the applicant's arguments).

We strongly encourage the BIA to assign the Floroius' case to a different judge on remand in order to avoid any perception of lingering bias. *Cf. Georgis v. Ashcroft*, 328 F.3d 962, 970 (7th Cir. 2003) (citing Circuit Rule 36 of the United States Court of Appeals for the Seventh Circuit, which establishes the same default rule for cases remanded to federal district courts after trial). We further note that this is the second time we have faulted this immigration judge for basing his decision on unsupported speculation about an asylum applicant. *See Ko v. Gonzales*, 421 F.3d 453, 456 (7th Cir. 2005). We further direct the clerk to send a copy of this opinion to the Attorney General of the United States so that he may determine whether any disciplinary action against the immigration judge is warranted.

### Conclusion

For the reasons stated above, we grant the petition for review, reverse the decision of the Board and remand for further proceedings consistent with this opinion.

PETITION FOR REVIEW GRANTED;
REVERSED and REMANDED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*