06-1469-ag
Ali v. Mukasey

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued: February 19, 2008                                    Decided: June 18, 2008)

Docket No. 06-1469-ag

_____

PETER CONRAD ALI,

*Petitioner*,

− v. −

MICHAEL B. MUKASEY,[1] ATTORNEY GENERAL OF THE UNITED STATES,

*Respondent.*

_____

Before: KEARSE, CALABRESI, and KATZMANN, *Circuit Judges.*

_____

Petition for review of a decision of the Board of Immigration Appeals ("BIA") affirming a decision by Immigration Judge ("IJ") Alan Vomacka and terminating the petitioner's grant of deferral of removal under the Convention Against Torture ("CAT"). We hold that the IJ's seeming bias against the petitioner and reliance on unfounded assumptions about homosexuals deprived the petitioner of his right to a fair hearing. Accordingly, the petition for review is GRANTED, the decision of the BIA is VACATED, and this case is REMANDED to the BIA for further proceedings consistent with this opinion, including assignment to a different IJ.

_____

---

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Michael B. Mukasey has been substituted for former Attorney General Alberto R. Gonzales as a respondent in this case.

LEON FRESCO (Christopher Nugent, *of counsel*), Holland & Knight LLP, Miami, Fla. (Olivia Cassin, The Legal Aid Society, Civil Practice Area, New York, N.Y., *on the brief*), *for Petitioner*.

THOMAS H. DUPREE, U.S. Department of Justice (Peter D. Keisler, David M. McConnell, Papu Sandhu, *on the brief*), Washington, D.C., *for Respondent*.

_____

CALABRESI, *Circuit Judge*:

Petitioner Peter Conrad Ali, a forty-two-year old Guyanese native and citizen, petitions for review of an order of the BIA affirming IJ Vomacka's decision to terminate his grant of deferral of removal under the CAT. In light of the inappropriate remarks made by IJ Vomacka – which included gratuitous comments on the petitioner's sexuality, as well as unfounded speculations about homosexuals in general – we believe the appropriate course is to grant the petition for review, vacate the BIA's decision, and remand this case for a rehearing before a new IJ.

**I.  BACKGROUND**

A.  *The 1997 and 1999 Deportations*

Ali came to the United States from Guyana in 1980, at age fourteen, and attained lawful permanent resident status five years later. Over the course of the next ten years, he established a long arrest record and was convicted of nine theft-related crimes. In 1995, he was placed in removal proceedings, pursuant to 8 U.S.C. § 1251(a)(2)(A)(ii) (transferred to 8 U.S.C. § 1227(a)(2)(A)(ii)), for having been convicted of two crimes involving moral turpitude. And in September 1997, he was deported to Guyana.

Sometime thereafter, immigration officials discovered that Ali had reentered the U.S. In December 1998, the Immigration and Naturalization Service ("INS") served him with a Notice of Intent/Decision to Reinstate Prior Order, pursuant to 8 U.S.C. § 1231(a)(5), which restored the

prior deportation order and charged Ali with illegal reentry. In accordance with that order, Ali was deported for a second time in March 1999.[2]

But Ali found his way back into the U.S. And in July 2000, immigration authorities placed Ali in removal proceedings once more. As before, they reinstated the August 1997 deportation order and charged Ali with illegal reentry. This time, however, when Ali was in INS custody, he indicated that he wished to apply for relief from removal.

B.      *Ali's Application for Relief from a Third Deportation*

In May 2004, Ali filed for asylum, withholding of removal, and relief under the CAT, claiming that he had experienced past torture and that he feared future torture by the Guyanese government because of his ethnicity (he is of East Indian ancestry) and the fact that he is a criminal deportee. More specifically, Ali gave the following account, which we have culled from his Application for Asylum and/or Withholding of Removal and Declaration in Support of the Petition for Convention Against Torture Protection.

Upon arrival at the airport in Guyana in August 1997, uniformed Guyanese police or immigration officers arrested Ali and forced him into a dark, hot holding room. There, he was interrogated about his criminal history, handcuffed, deprived of food, and detained overnight. The next morning, Guyanese officials transferred him to another precinct where he was detained for several days, again without food, and further interrogated about his criminal record. On the first day of this detention, police officers handcuffed and beat him until he lost consciousness. On the morning of the second day, two police officers entered Ali's cell wearing masks; one raped and sodomized him. The other remarked that they did not want deportees from the U.S. in

---

[2] According to INS files, the U.S. Attorney's office for the Eastern District of New York declined to prosecute Ali for illegal reentry at that time.

Guyana. Ali lost consciousness during the assault; he awoke to find himself chained, hanging from the jail cell bars, and bleeding from his rectum.

A day or so after that incident, Guyanese authorities transferred Ali to another precinct, and during processing, he was able to escape. He went first to Berbice, and then, via speedboat, to Brazil, where he met a smuggler named Juan. With Juan's help (and in exchange for $4,000, which Ali's mother wired to Juan from New York), Ali took a boat to Guatemala, and a bus into Mexico; he crossed the U.S.-Mexico border on foot somewhere in Arizona. From there, he hitchhiked his way back to his mother's house in Queens, New York.

In 1999, after he was deported to Guyana for the second time, Ali was again arrested by Guyanese authorities upon arrival. Believing that they would mistreat him, he fled from their custody. Once again, he went to Berbice, where he located Juan. With Juan's son's passport, Ali traveled to Jamaica. And in Jamaica, he obtained a Jamaican passport with a U.S. visa, which he used to board a flight from Jamaica to John F. Kennedy airport in New York City.

C.    *The Merit's Hearing before IJ Iskra*

IJ Wayne Iskra, sitting in Arlington, Virginia, held a hearing on the merits of Ali's case on July 16, 2002. At that hearing, Ali testified about the events described in his application and responded to questions. The Government called attention to Ali's failure in 1999 to tell the INS about the abuse he claimed to have experienced in 1997 and to seeming inconsistencies in Ali's account. For example, it confronted Ali with an INS document dated August 2000 that, according to the Government, indicated that Ali told INS officials that he came to the U.S. in January 2000, not sometime in 1999, and that he arrived by boat, not by plane, as he later claimed.[3] Ali denied giving the INS this information. The Government also presented Ali with

_____

[3] Because the INS did not submit this document in advance, but rather sought to have it admitted into evidence during the hearing, IJ Iskra refused to receive it for the truth of the matter

letters , purportedly written by Ali and addressed to the Guyanese Embassy in Washington, D.C., in which the author indicated that, if returned to Guyana, he would rob banks, sell crack cocaine to the Guyanese people, and blow up Guyana. Ali stated that he did not write these letters.

D.     *IJ Iskra's July 16, 2002 Decision*

On July 16, 2002, IJ Iskra issued a ruling on Ali's requests for relief. *See In re Peter Conrad Ali*, No. A 30 105 177 (Immig. Ct. Arlington, Va., July 16, 2002). IJ Iskra found that Ali had not met his burden of proving that he was persecuted because of his ethnicity, so he was not eligible for asylum. But IJ Iskra found credible Ali's account of the physical and sexual abuse he experienced in Guyana in 1997. "[A]lthough this respondent . . . has committed many offenses and has made inconsistent statements," IJ Iskra stated, "[i]t is the opinion of the Court . . . that the respondent's testimony with respect to what happened to him when he was arrested in 1997 by the Guyanese authorities is credible." IJ Iskra emphasized that Ali's account was corroborated by the background information submitted, which documented "inhumane and degrading" prison conditions and recorded "numerous instances" of murder, torture, and ill treatment by the Guyanese police, including instances involving "criminal suspects."

On the basis of this credibility finding, IJ Iskra concluded that Ali had met his burden of proving that he would be subject to torture if returned to Guyana. IJ Iskra denied Ali's request for withholding of removal under the CAT, however, because Ali's criminal history suggested that he would be a danger to the U.S. community. Instead, IJ Iskra granted Ali deferral of removal and left it to "the discretion of the INS as to whether or not [Ali] shall be released from custody." Neither party appealed this decision.

E.     *The Termination of Deferral of Removal Proceedings before IJ Iskra*

---

asserted. He admitted it solely for its impeachment value.

In July 2003, the Department of Homeland Security ("DHS")[4] filed a motion to terminate Ali's deferral of removal, pursuant to 8 C.F.R. § 1208.17(d)(1).[5] DHS asked the Immigration Court to reinstate Ali's case to its calendar to consider "new evidence," evidence that would show that country conditions in Guyana no longer supported Ali's CAT claim.[6]

DHS attached to its motion its "new evidence," which included the results of a State Department inquiry, conducted at DHS's request, "into the specific conditions for returning criminal aliens." On the basis of an exchange with the U.S. Embassy in Guyana, the State Department wrote a letter to DHS indicating that it "d[id] not know of any cases of systematic abuse of criminal deportees upon their return to Guyana or instances of singling out of criminal deportees for abuse by police," nor did it know "of any cases of abuse by the immigration police in Guyana." DHS also attached two letters that Ali allegedly sent to the Guyanese Embassy in Washington (the same letters referenced in the July 16, 2002 hearing). These stated, in substance, that Ali had no family left in Guyana and would make trouble there if the Embassy gave U.S. immigration officials travel documents for him.

The DHS motion also argued that Ali remained "a danger to the community if released," and that "DHS will not be allowed to detain him indefinitely" because "[t]he INA contains an implicit limitation" on detention. The detention period allowed is only that which "is reasonably

---

[4] On March 1, 2003, the INS ceased to exist. Its responsibilities were divided among three agencies formed within DHS.

[5] This provision states that, at any time while deferral of removal is in effect, the INS may file a motion with the Immigration Court having administrative control over the matter – in this case, the Immigration Court sitting in Arlington, Virginia – to schedule a new hearing to consider whether deferral of removal should be terminated. 8 C.F.R. § 1208.17(d)(1). If the INS has offered relevant evidence that was not presented at the prior hearing, the Immigration Court should grant the motion and make a *de novo* determination as to whether the alien will more likely than not be tortured in the country to which removal has been deferred. *Id.* at (d)(3).

[6] DHS's motion to terminate may also have been motivated by a habeas petition that Ali filed in the Eastern District of Virginia challenging his continued detention.

necessary to bring about removal"; "[o]nce removal is no longer reasonably foreseeable, continued detention is no longer authorized under the INA."

IJ Iskra held a preliminary hearing on the motion in November 2003. He convened a hearing on the merits on February 3, 2004, but then granted a continuance until March 25, 2004, to allow counsel for DHS to seek State Department review of some of Ali's submissions and to arrange for State Department witnesses to testify telephonically (IJ Iskra implied that he would otherwise give the State Department letter limited weight).

On March 5, 2004, however, the U.S. Attorney's Office for the Eastern District of New York started criminal proceedings against Ali, charging him with illegal re-entry.[7] Accordingly, the U.S. Marshals Service in New York took Ali into custody and IJ Iskra, upon DHS's motion, closed Ali's proceedings "until a time when [Ali] can be returned to DHS custody."

F.      *The Change of Venue and the 2004 Proceedings before IJ Vomacka*

About two months later, on May 27, 2004, the District Court for the Eastern District of New York held a bond hearing as to Ali. And for reasons that are not clear from the record, the parties discussed releasing Ali from the Marshals' custody and returning him to DHS custody.[8]

---

[7] According to DHS, these proceedings were instituted at the request of Immigration and Customs Enforcement ("ICE"), which is an investigative arm of the DHS.

[8] Counsel for DHS suggested that Ali wanted to be restored to DHS custody to ensure that his habeas petition in the Eastern District of Virginia could be resolved (otherwise the District Court might have had to grant a motion by the U.S. Attorney's Office in Virginia to dismiss Ali's petition). But before us, Ali contends that had he remained in the custody of the U.S. Marshals, his habeas petition would not have been affected because that custody flowed from his previous detention under DHS custody; he asserts that the real reason he was released into DHS custody was so that his CAT termination case could be completed in New York, at a detention facility where the case would be assigned to either IJ Alan Page or IJ Vomacka. The docket report from the Eastern District of New York suggests still another version of events: it indicates that Ali's counsel in his criminal case (an attorney different from the attorney representing him then, or the one representing him now, in his immigration case) requested to have Ali released into DHS custody in order to resolve his outstanding problem with the immigration authorities. We have no insight into why Ali's counsel would have submitted such a request.

In any case, on June 2, 2004, after some confusion as to where DHS intended to place

-7-

That same day, DHS filed a motion in the Immigration Court in Arlington, Virginia, seeking to reopen the administratively closed CAT termination hearing and change venue to the Varick Street Detention Facility in New York. Meanwhile, on June 3, 2004, IJ Iskra granted DHS's request for a change of venue. And sometime later that month, the case was assigned to IJ Alan Vomacka. Ali promptly filed a request for a change of venue back to Virginia, which DHS opposed.[9]

At a hearing on July 22, 2004, IJ Vomacka expressed confusion about why the case was before him, and disapproval of the unusual way in which the case had proceeded.[10] In his view, "the normal course of events" would be to return Ali to Virginia. He failed to see how a prosecution for illegal reentry in New York made New York City "the logical place for his removal proceeding." IJ Vomacka also questioned whether, as a practical matter, Ali could be both in DHS custody and attending ongoing criminal proceedings in the Eastern District of New

---

Ali, the District Court advised the parties of its intent to release Ali into DHS custody.

[9] DHS complained of the "undue burden" it would incur should it have to arrange for and transport Ali from one detention facility to another.

[10] For example, IJ Vomacka asked counsel, "Well, is he still being prosecuted or not?", to which counsel for DHS replied, "He's still being prosecuted to my knowledge." "Why did they release him into the custody of Immigration?" IJ Vomacka then inquired. "What are they going to do with their prosecution if he's deported out of the country?" Counsel responded that he "wasn't prepared to answer this question right now" and would "have to look into it."

On the basis of these responses, IJ Vomacka stated that he "d[id]n't see any reason the case has to be done here [in New York]." "I don't think it makes sense for me to sit here and listen to tape recordings of a prior hearing, which I think I would have to do under the regulations and then try to assess whether I can believe the respondent . . . [a]ll because the Government doesn't want to take him in a van down to Virginia," IJ Vomacka remarked. "I don't think that's justified." IJ Vomacka believed it would take "hours" to review the record, and he "really hate[d] to think about spending five or six hours reviewing everything that ha[d] happened, when for Judge Iskra, it would probably take half an hour to remember whatever was important about the last proceedings."

York.[11]  IJ Vomacka memorialized his concerns in a July 30, 2004 "Memorandum as to the Status of the Removal Proceedings."[12]

Nonetheless, on August 10, 2004, IJ Vomacka held another hearing on the matter and changed his position on the appropriateness of allowing the case to proceed in New York.  At this point he believed, based on "representation[s]" from the Government, that DHS and the District Court had reached an "agreement" by which, "whether or not I transfer venue back to the Immigration Court in Arlington, Virginia, the respondent is going to stay here."  Or, as he subsequently explained it, "The District Court in New York is going to want him to stay here until the [criminal] case is wrapped up because who knows what delays will occur if he goes to Virginia and has to come back and enter a plea or whatever may be necessary."  Plus, "if I change venue to Virginia, there's going to be a period of delay, [and] the Immigration case won't go forward."  Therefore, essentially to make use of the time Ali would have to spend in New York while he entered his plea and awaited sentencing, IJ Vomacka decided to deny Ali's request to

---

[11] "[I]f an alien is going to be in Marshal's custody for some criminal prosecution, I'm usually told that there is no feasible way to transfer him over here for a hearing in the Immigration case.  So I don't know why it's being done differently or even if it can be done differently in this case."

[12] In this memo, IJ Vomacka indicated that he would endeavor to complete the CAT proceeding before the criminal prosecution, if that was, indeed, the District Court's preference, but that such a course "raises three points of difficulty."  First, Ali had thus far been represented *pro bono* by an attorney for the Catholic Charities Immigration Services in Maryland.  This attorney was unavailable to participate in hearings in New York.  Second, the proceedings before IJ Iskra "were never transcribed because the D.H.S. did not appeal that ruling."  And "[a]lthough the D.H.S. trial attorney has suggested that the reopened removal case is to be considered de novo, this does not mean that the existing evidence and testimony can be ignored."  Third, assessing Ali's CAT claim required a determination of whether it was probable that Ali would be tortured in Guyana.  And "[i]f [Ali] receives any sentence which will require him to serve more than a few months in jail, the degree to which torture is probable becomes more speculative."  "The longer the sentence which may [be] imposed on [him], the greater the degree of uncertainty which may arise," IJ Vomacka continued, and in this case, "the potential sentencing range . . . might vary from a minimum of time already served to a maximum of many years."

-9-

transfer the case back to Virginia and to proceed with it in New York.[13]  He scheduled a merits hearing for October 2004.

On September 15, 2004, Ali submitted a motion to supplement the record with evidence that he feared persecution in Guyana based on his sexual orientation (as counsel for Ali explained to the court, Ali had "recently informed counsel that he is a homosexual").  IJ Vomacka interpreted this motion as an "implied request for permission to amend respondent's relief claim by raising a new basis for relief" and found it unjustified.

On October 19, 2004, IJ Vomacka conducted a hearing on the merits of DHS's motion to terminate Ali's deferral of removal.  He heard testimony from expert witnesses, including DHS officers who had interviewed Ali in 1998 and 2000, respectively, and a human rights lawyer with Amnesty International.  He also heard testimony from Ali, who described again the 1997 rape and his 1997 and 1999 escapes from the Guyanese authorities.  Ali also explained why, in 2000, he did not tell U.S. immigration officials about the rape ("I was . . . too embarrassed to tell anyone that. . . .  [I]t's not something that you would tell anyone"), and he admitted writing "some threatening letters to the Guyanese Embassy" out of fear that he would be deported, tortured, and killed.  Counsel for DHS then cross-examined Ali about the details of his account and confronted him with reports from Interpol, which stated that Interpol had no record of Ali's arrest in Guyana.  IJ Vomacka did not review the proceedings before IJ Iskra because he found it difficult to hear the tape recordings and because, owing to the lack of an appeal from the earlier decision, the hearing had not been transcribed.

---

[13] The record on appeal does not evidence how Ali's criminal case did, in fact, proceed. But a docket report from the Eastern District of New York shows that in June and July of 2004, the Government was working on filing a response to Ali's pre-trial motions.  Ali entered a guilty plea on October 5, 2004.  And on January 7, 2005, he was sentenced to two months' imprisonment and three years' supervised release.

On November 10, 2004, IJ Vomacka issued his oral decision. *See In re Peter Conrad Ali*, No. A 39 105 177 (Immig. Ct. N.Y. City, Nov. 10, 2004). He determined that Ali was no longer entitled to deferral of removal because he failed to present enough credible evidence that he would more likely than not be tortured in Guyana. The decision emphasized four factors. First, the record included "reasonably reliable evidence that when [Ali] was questioned in May of 2000, he told [an] Immigration officer that he had no fear of persecution if returned to Guyana." Second, a report submitted by DHS indicated that Interpol had no arrest warrants or other records concerning Ali, even though Ali claimed that he twice escaped from Guyanese authorities. Third, Ali's account of his return to the U.S. following his second deportation was "very close to being 'inherently implausible'" because it involved "[too] many lucky breaks and coincidences." Fourth, a psychological evaluation by the Division of Immigration Health Services indicated that Ali possessed "traits of paranoid, avoidant, dependent and obsessive compulsive personality disorder." This report, combined with the threatening letters Ali sent to the Guyanese Embassy, suggested to IJ Vomacka that Ali was "capable of imaging [sic] or exaggerating harm" and that he might "invent[] problems . . . to avoid being sent back to Guyana."

As for Ali's sexual orientation, IJ Vomacka reiterated his belief that this information could have been raised and fully explored during the earlier hearings. He noted that "[i]t [wa]s not easy for the Court to understand why a respondent would be willing to disclose forcible rape by jail guards, but not willing to discuss his own sexual orientations [sic] as a homosexual." But in any event, IJ Vomacka explained, other evidence in the record (*e.g.*, the letters to the Guyanese Embassy) suggested that Ali's announcement of his homosexuality may have been just another attempt to delay the proceedings ("[T]he raising of a new issue, practically on the brink of what should be his final hearing, tends to look as though it may be another attempt at obstruction . . . .").

G.     *The First Appeal to the BIA*

On December 10, 2004, Ali filed a timely appeal to the BIA, arguing (1) that IJ Vomacka should have considered the previous proceedings before IJ Iskra, (2) that, given IJ Iskra's prior decision, IJ Vomacka was collaterally estopped from making an adverse credibility determination, and (3) that IJ Vomacka's adverse credibility determination was clearly erroneous.

In an April 12, 2005 decision by board member Juan Osuna, the BIA found that collateral estoppel did not apply, but nonetheless remanded the case because IJ Vomacka failed to consider an "integral component" of the record:  IJ Iskra's decision. *See In re Peter Conrad Ali*, No. A 39 105 177 (B.I.A. Apr. 12, 2005).[14]  The BIA deemed this failure particularly significant "given [the] apparently favorable credibility finding in [the] prior decision – unappealed by DHS – which by logic should be afforded substantial deference if it is based upon a reasoned analysis of the evidence then of record and is not contradicted by newly presented evidence."  In its order remanding the case, the BIA also discouraged IJ Vomacka from drawing inferences from Interpol's lack of records regarding Ali.[15]

H.     *The 2005 Proceedings before IJ Vomacka*

At a hearing in June 2005, IJ Vomacka took yet another tack.  He first expressed disappointment with Ali for raising on appeal his failure to consider the proceeding before IJ Iskra ("I thought that it was made clear to the parties that I was not going to pay any attention to the prior tapes.  And so I'm not . . . particularly happy to know that on appeal the issue was raised

---

[14] 8 C.F.R. 1208.17(d)(3) requires the Immigration Court to base its determination of the petitioner's eligibility for CAT relief "on the *record of proceeding* and initial application in addition to any new evidence submitted by the Service or the alien" (emphasis added).

[15]  The Board was disinclined to consider "the failure of Guyanese officials to create Interpol records for [Ali]" as a "'valid ground' on which to base an adverse credibility finding, especially as viewed through the lens of the Immigration Judge's speculation as to police procedure at airports." (internal citation omitted).

that I should have relied on those tapes.")[16]  Nonetheless, IJ Vomacka complied with the order and reviewed the record of the prior proceedings.  Now that the case was on remand, he also allowed Ali to pursue his claim that he would be tortured in Guyana on the basis of his sexual orientation, and he accepted additional evidence.

At hearings in August and September 2005, IJ Vomacka heard testimony from Ali's mother, who stated that he returned from Guyana in 1997 wearing dirty, blood-stained clothes, from a psychologist, who described Ali's mental health problems (post traumatic stress disorder and severe depression), and from Ali, who explained why he believed he would be tortured because of his homosexuality.  Ali stated that before he was raped, the police officers "curse[d] [him] and called [him] anti-man, [which] means faggot."  He further testified that the punishment in Guyana for sodomy is life in prison, and that he would be tortured if imprisoned for that crime. Ali explained that he did not raise his sexual orientation earlier in the proceedings because he did not consider himself gay at that time.  IJ Vomacka also accepted affidavits from two representatives of the Guyana Human Rights Association, which described the violence and hostility directed towards homosexuals and criminal deportees in Guyana.[17]

---

[16] IJ Vomacka reiterated these views in the order that he ultimately issued on remand.  In that order, he devoted multiple pages to explaining why he had not reviewed the hearings before IJ Iskra when the case first came before him.  He also indicated that he believed that his qualifications as an IJ, and impliedly his judgment, surpassed IJ Iskra's.

[17] The affidavit of Michael McCormack stated that "Guyana is a place where gay people cannot live freely and safely given the significant hostility [that] society and government show them," and that "[i]f someone is openly gay in Guyana, they obviously may be subjected to severe violence by the police"; "[f]or example, a group of gay prostitutes was put into police custody 5 years ago and they were brutalized and raped by the police."  The McCormack affidavit also indicated that criminal deportees are severely stigmatized in Guyana, that local newspapers post their pictures, and that five Guyanese criminal deportees had been murdered in recent months, perhaps the result of a "death squad," perceived to have ties to the Guyanese government, that was formed in retaliation for the high rate of crime in Guyana.

The affidavit of Linda Peake described Guyana as "a virulently homophobic country" where "[v]iolent gay bashings are known to occur," where Ali "would very probably be subjected to violent assaults," and where "the police would not afford him any real protection."  The Peake

-13-

In the end, IJ Vomacka reaffirmed his prior decision. *See In re Peter Conrad Ali*, No. A 30 105 177 (Immig. Ct. N.Y. City, Oct. 17, 2005). He did so on the basis of several "findings." First, he found that Ali's claims – that he would more likely than not be tortured because of criminal deportee status and because of his sexual orientation – were incompatible. He opined that "violent dangerous criminals and feminine contemptible homosexuals are not usually considered to be the same people," and therefore Ali was less likely to be viewed in Guyana as a member of either disfavored group.

Second, he concluded that the evidence supported neither of Ali's claims. With respect to the likelihood of torture as a criminal deportee, the IJ found a "lack of specific objective evidence" that such conduct occurred. As to the likelihood of torture as a homosexual, IJ Vomacka wondered how anyone in Guyana would even know that Ali was a homosexual. Ali would "need a partner or cooperating person" in order to be recognized as a homosexual, IJ Vomacka theorized, but "there's reason to be concerned about whether [Ali] is likely to form such a close relationship within a foreseeable period of time." IJ Vomacka noted that Ali is a convicted criminal with "professed mental problems" and "some problems with his personality"; "[f]urthermore, . . . [he] is not particularly communicative or articulate. He's not particularly skilled and mature in the way he expresses himself, shows his feelings, etc." Therefore, "the picture of [Ali ]as a proud, professed homosexual in Guyana seems to be more an expression of wishful thinking than something that's particularly likely to come true." In any case, IJ Vomacka continued, the evidence failed to establish that homosexuals in Guyana are persecuted, much less tortured.

---

affidavit also corroborated Ali's statement that in Guyana, "buggery" (homosexual sodomy) may result in a sentence of life imprisonment.

-14-

Third, IJ Vomacka found that Ali was not credible. IJ Vomacka noted "material and substantial inconsistencies in the way [Ali] has described the series of events in 1997 since he was placed in these proceedings." For example, Ali gave varying accounts of the length of his detention and the time of day of the rape. Meanwhile, his account of a prison altercation in 2004, purportedly prompted by comments about Ali's homosexuality, did not correspond with jail reports. IJ Vomacka also took issue with Ali's accounts of his two trips back to the U.S.[18] Finally, IJ Vomacka pointed out that in 2002, Ali denied writing letters to the Guyanese embassy, but in 2004 he admitted writing those same letters. IJ Vomacka concluded that Ali was "fluent in the language of lying" and not "a credible person in general," that he had no "particular interest or devotion to telling the truth while he's under oath," and that he was "entirely capable of having invented the entire story."

I.      *The Second Appeal to the BIA*

Ali filed a timely appeal with the BIA. He contended that IJ Vomacka had again failed to give sufficient deference to the proceedings before IJ Iskra, thereby violating the law of the case doctrine and his right to due process. Ali also argued that IJ Vomacka failed to develop an adequate record as to country conditions in Guyana, that he applied the wrong standard of law, that he failed to consider all the record evidence, that he displayed bias during the proceedings, and that he made a clearly erroneous credibility finding.

---

[18] Regarding Ali's 1997 trip, IJ Vomacka noted a number of discrepancies between Ali's testimony and his previous statements (*e.g.*, the type of vehicles on which he traveled, the time spent on each), as well as certain details that seemed implausible (*e.g.*, taking just a day and a night to drive from Arizona to New York, walking through fields in northern Mexico during the hottest season of the year, traveling all the way to New York without washing or changing his supposedly blood-soaked clothes). As to Ali's second trip from Guyana to the U.S., IJ Vomacka cited a previous signed statement indicating that Ali arrived by boat from Canada in 2000, which, in his view, contradicted Ali's testimony that he flew into New York from Jamaica in 1999.

-15-

The BIA disagreed. In a March 27, 2006 decision – which like the 2005 decision was a single board member decision (this one written by board member Lauri S. Filppu) – the BIA concluded that all of Ali's claims were meritless. *See In re Peter Conrad Ali*, No. A 39 105 177 (B.I.A. Mar. 27, 2006). The BIA held that the law of the case argument failed because the regulations required IJ Vomacka to conduct a new hearing and make a *de novo* determination. Further, IJ Vomacka allowed Ali to make an entirely new claim – fear of torture because of sexual orientation – so IJ Iskra's factual findings could not have controlled. The BIA also found that Ali's challenge to IJ Vomacka's adverse credibility determination failed because that determination was supported by material inconsistencies between Ali's testimony and his written statements, as well as implausible details in his story. As for Ali's charge of bias, the BIA was "troubled by several of [IJ Vomacka's] gratuitous remarks" and speculations – namely, his lengthy speculation "about the respondent's lack of social skills and the fact that it would be unlikely that he would be able to establish an open homosexual relationship in Guyana" – but it did not find that any of IJ Vomacka's comments rendered the hearing unfair.

The BIA also made its own assessment of the merits of Ali's claim and concluded that he had failed to carry his burden. "Nothing in the record indicates that criminal deportees have been harmed or tortured by Guyanese authorities," and Ali failed to show that violence towards homosexuals in Guyana (of which there was evidence) would rise to the level of torture or would occur "by or with the consent or acquiescence of public officials."

J.      *The Appeal to Our Court*

Ali filed a timely petition for review with this Court, in which he argues (1) that IJ Vomacka's adverse credibility determination violated the BIA's previous remand order because the documents and evidence upon which IJ Vomacka relied were part of the record before IJ Iskra, and IJ Vomacka never determined that IJ Iskra's credibility determination was

-16-

unreasonable; (2) that IJ Vomacka's adverse credibility determination violates the principle of collateral estoppel, the law of the case doctrine, and the Due Process Clause and is not supported by substantial evidence; and (3) that IJ Vomacka violated Ali's due process rights by conducting an unfair hearing and by failing to consider all the evidence in support of his sexual orientation-based claim. For the reasons set forth below, we reject Ali's law of the case and estoppel arguments. We consider in depth only the most fundamental of his other claims – that he did not have a fair and full opportunity to have his case considered – and we vacate and remand the BIA's decision.

## II. JURISDICTION

The Government contends that this petition is subject to the jurisdictional bar in 8 U.S.C. § 1252(a)(2)(C) (precluding us from reviewing any final order of removal against an alien who is removable by reason of having committed a criminal offense covered, inter alia, in 8 U.S.C. § 1182(a)(2)). The deferral of removal proceedings all stem from Ali's 1995 deportation order, which was based on Ali's two convictions of crimes involving moral turpitude. Ali disagrees, arguing, *inter alia*, that he is now removable by reason of illegal reentry, so the jurisdiction-stripping provision does not apply. We need not decide this question because, irrespective of the reason for removability, we retain jurisdiction to consider "constitutional claims" and "questions of law," 8 U.S.C. § 1252(a)(2)(D), including Ali's collateral estoppel, law of the case, and procedural fairness arguments.

## III. COLLATERAL ESTOPPEL AND LAW OF THE CASE

A.  *Collateral Estoppel*

The "fundamental notion" of the doctrine of collateral estoppel, or issue preclusion, "is that an *issue of law or fact* actually litigated and decided by a court of competent jurisdiction in a prior action may not be relitigated in a subsequent suit between the same parties or their privies."

-17-

*United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 718-19 (2d Cir. 1993). Accordingly, collateral estoppel applies when: (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was "actually litigated and actually decided," (3) there was "a full and fair opportunity for litigation in the prior proceeding," and (4) the issues previously litigated were "necessary to support a valid and final judgment on the merits." *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986). This doctrine has long been recognized to apply in immigration proceedings. *See Matter of Fedorenko*, 19 I. & N. Dec. 57, 61-62 (B.I.A. 1984).

Nonetheless, it does not require a remand in this case. We reach this conclusion not because, as the Government argues, a grant of deferral of removal is a temporary form of relief and therefore can never be a "final judgment on the merits." A decision awarding a temporary form of relief can constitute such a judgment. *See Lummus Co. v. Commonwealth Oil Refining Co.*, 297 F.2d 80, 89 (2d Cir. 1961) ("Whether a judgment, not 'final' in the sense of 28 U.S.C. § 1291, ought nevertheless be considered 'final' in the sense of precluding further litigation of the same issue, turns upon such factors as the nature of the decision . . . , the adequacy of the hearing, and the opportunity for review."). Rather, we base our conclusion on our conviction that "[c]ollateral estoppel in the administrative context must be informed by considerations of agency structure and legislative policy." *Duvall v. Attorney Gen.*, 436 F.3d 382, 391 (3d Cir. 2006). In cases dealing with deferral of removal under the CAT, the existing regulations – promulgated by the Justice Department to implement the nation's obligations under the CAT – make clear that the doctrine of collateral estoppel has limited application. First, the regulations state that after an alien is granted deferral of removal, the IJ shall inform her that deferral of removal "[i]s effective only until terminated" and "[i]s subject to review and termination if the immigration judge determines that it is not likely that the alien would be tortured in the country to which removal has been deferred." 8 C.F.R. § 1208.17(b)(1)(iii), (iv). In other words, it is clear that the merits

-18-

of the alien's CAT claim may be revisited. In addition, the regulations direct the immigration judge, when considering whether to terminate deferral of removal, to "conduct a hearing and make a de novo determination." *Id.* § 1208.17(d)(3). Under the circumstances, Ali's attempt to invoke collateral estoppel mechanically fails.[19]

B.      *Law of the Case*

The law of the case doctrine, while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent "cogent" and "compelling" reasons such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000) (citations and internal quotation marks omitted). Under this doctrine "courts are understandably reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge or court." *Lillbask ex rel. Mauclaire v. Conn. Dept. of Educ.*, 397 F.3d 77, 94 (2d Cir. 2005) (citation and internal quotation marks omitted).

Assuming, *arguendo*, that the doctrine applies to termination hearings under the CAT (we have some doubts, given that the regulations governing such proceedings require *de novo* review of an alien's CAT claim, *see* 8 C.F.R. § 208.17(d)(3)), this case presented a "cogent" and "compelling" reason to revisit the prior findings. Specifically, both the Government and Ali offered evidence that was not before IJ Iskra, evidence that went directly to the issue of whether Ali was likely to be tortured in Guyana.

---

[19] Our interpretation of how the doctrine of collateral estoppel applies to this context is informed by and limited to the facts at hand. Thus, we do not exclude the possibility that we might view Ali's argument differently had the Government repeatedly sought to terminate deferral of removal, revisiting the exact same body of evidence until it convinced an Immigration Court to alter its estimation of Ali's CAT claim.

## IV.    FAIRNESS OF THE PROCEEDINGS

Having rejected Ali's first two legal claims, we now address his third: that the proceedings below were fundamentally unfair, resulting in a decision that cannot be reviewed in any meaningful way.

All aliens within the United States, "whether their presence here is lawful, unlawful, temporary, or permanent," are entitled to procedural fairness.  *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *see also Burger v. Gonzales*, 498 F.3d 131, 134 (2d Cir. 2007) ("Aliens, of course, are entitled to due process.").  In the removal context, that means that an alien who has "passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness." *Shaugnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953).  At a minimum, she "must be afforded the opportunity to be heard at a meaningful time and in a meaningful manner," *Burger*, 498 F.3d at 134 (internal quotation marks omitted), by "an impartial and disinterested tribunal," *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980), and in a proceeding that is adequate to allow judicial review, *United States v. Mendoza-Lopez*, 481 U.S. 828, 839 n.17 (1987).  Thus, "when an IJ's conduct results in the appearance of bias or hostility such that we cannot conduct a meaningful review of the decision below, we remand." *Islam v. Gonzales*, 469 F.3d 53, 55 (2d Cir. 2006); *see also Guo-Le Huang v. Gonzales*, 453 F.3d 142, 148 (2d Cir. 2006) (ordering remand "because of the IJ's apparent bias and hostility toward" the petitioner).

Ali's fairness argument is multi-faceted.  He has alleged that the agency failed to give meaningful consideration to his evidence.  He has further alleged that IJ Vomacka engaged in impermissible prejudgment, personal speculation, bias, and conjecture.  And he has suggested that the entire proceeding – from the timing of the Government's motion to reconsider his grant

of deferral of removal, to the unusual change of venue, to IJ Vomacka's continued refusal to defer to IJ Iskra's credibility finding – amounted to a violation of due process. We confine our discussion to IJ Vomacka's inappropriate comments, as these alone are enough to require a remand and review by a new IJ.[20]

We begin with the displeasure IJ Vomacka expressed at being told that he was to reconsider the case, taking into account the record of proceedings in Virginia. At a preliminary hearing on June 9, 2005, IJ Vomacka stated that he was "not . . . particularly happy to know that on appeal the issue was raised that I should have relied on those tapes" because he "thought that it was made clear to the parties that [he] was not going to pay any attention to the prior tapes." [**A 433**] He also said that "[he] honestly d[id] not understand the idea that as a Judge, [he] should base [his] decision on a prior decision by another Judge." And when he issued a decision on Ali's case on October 15, 2005, IJ Vomacka devoted multiple pages to explaining his disagreement with the remand, including a paragraph in which he compared himself favorably to IJ Iskra. These comments, in and of themselves, do not exhibit the level of bias that we have said deprives a petitioner of a fair hearing, but in combination with what followed, they are more than merely troubling.

We believe IJ Vomacka clearly abrogated his "responsibility to function as a neutral, impartial arbiter," *Islam*, 469 F.3d at 55, when, without reference to any support in the record, he voiced stereotypes about homosexual orientation and the way in which homosexuals are perceived, both in the United States and Guyana. First, when discussing Ali's claims for relief, which were based on two different aspects of his identity, IJ Vomacka relied on what he called

_____

[20] Because we have every reason to believe that review by a new IJ will grant the petitioner all the process that is due, we need not and hence do not take any position on the petitioner's argument that the process that was given, taken as a whole, violated the Constitution.

"the common understanding" of criminals and homosexuals: "It seems to the Court that the common understanding, which I believe would apply from the U.S. to Guyana, would suggest that violent dangerous criminals and feminine contemptible homosexuals are not usually considered to be the same people . . . ." Therefore, he concluded, Ali was less likely to be viewed in Guyana as a member of *either* disfavored group and less likely to be tortured. IJ Vomacka cited no evidence in the record to support this conclusion, and from our reading of the record, there was none. Further, these comments demonstrated a fundamental misunderstanding of the basis for Ali's CAT claim. Ali claimed that he would likely be tortured in Guyana (a) because he is a homosexual, and (b) because he is a criminal deportee, but also (c) because he is a homosexual criminal deportee. In other words, he is a homosexual who, because of his criminal deportee status, almost certainly would be detained by government authorities upon arrival. By treating aspects of Ali's identity as incompatible, IJ Vomacka essentially dismissed, without consideration, a crucial component of Ali's application for relief.

IJ Vomacka made a second improper remark about homosexuals when he suggested that no one would perceive Ali as a homosexual unless he had "a partner or cooperating person." This comment appears to derive from stereotypes about homosexuality and how it is made identifiable to others. It is certainly not grounded in the record, which, as IJ Vomacka noted in another part of the decision, suggests that "an unmarried adult man with no children would be suspected of being a contemptible homosexual in Guyana."

IJ Vomacka's improper comments were not limited to those just mentioned. When discussing whether Ali would be able to "demonstrate that he was actually a homosexual" by walking down the street with a boyfriend, IJ Vomacka stated that "given [Ali's] criminal record, his professed mental problems, the length of time he's been detained in prison and other factors

about [Ali] and his background, it's not clear that [he] will, in fact, be likely to form a strong or close homosexual relationship whether in Guyana or the United States." IJ Vomacka then went on to note "problems with [Ali's] personality." For example, he described Ali as "not particularly communicative or articulate" and "not particularly skilled and mature in the way he expresses himself, shows his feelings, etc." Later in the proceeding, IJ Vomacka indicated (continuing to operate from the unfounded assumption that Ali would not be perceived as a gay man unless he consciously did something explicitly "homosexual") that he doubted Ali would "make his homosexuality obvious in public or draw the attention of the authorities or the police" because he is "a person who mostly tries to avoid conflict, slide away from problems, etc., as opposed to a person who deals directly with his difficulties."

These comments reflect an impermissible reliance on preconceived assumptions about homosexuality and homosexuals, as well as a disrespect for the petitioner. And taken together, they amount to the type of conduct that we have said "results in the appearance of bias or hostility such that we cannot conduct a meaningful review of the decision below" and we must remand.[21] *Islam*, 469 F.3d at 55; *see also Guo-Le Huang*, 453 F.3d at 150 (remanding "because of the IJ's apparent bias and hostility toward [the petitioner]"); *Floroiu v. Gonazles*, 481 F.3d 970, 974 (7th Cir. 2007) (remanding because the IJ's use of language of religious intolerance "taints the proceedings, erodes the appearance of fairness and creates substantial uncertainty as to whether the record below was fairly and reliably developed"); *Lopez-Umanzor v. Gonzales*, 405

---

[21] We note that this is not the first time that we have remanded a decision by IJ Vomacka based, at least in part, on improper suppositions and musings. *See, e.g.*, *Singh v. Mukasey*, No. 07-1797, 2008 WL 833099, at *2 (2d Cir. Mar. 26, 2008); *Xianghao Lian v. Gonzales*, 240 Fed. App'x 914, 915-16 (2d Cir. 2007); *Mei Zhen Huang v. Mukasey*, 256 Fed. App'x 406, 408 (2d Cir. 2007); *Rui Zhong Lu v. U.S. Dep't of Justice*, 217 Fed. App'x 44, 46-47 (2d Cir. 2007); *Gui Lin v. BIA*, 200 Fed. App'x 49, 52 (2d Cir. 2006); *Zhen Tong Weng v. Gonzales*, 193 Fed. App'x 15, 16 (2d Cir. 2006).

F.3d 1049, 1059 (9th Cir. 2005) (remanding "[b]ecause the IJ's disbelief of Petitioner rested on personal speculation, bias, conjecture, and prejudgment" about domestic violence "and because he refused to hear testimony that would have challenged those assumptions"). To the extent that the BIA found otherwise, we disagree. *Floroiu*, 481 F.3d at 974 ("The BIA's conclusion that the IJ did not violate due process is a conclusion of law which we review de novo.").

We also note that the BIA's review of this case in no way cured the defects of the proceeding below. While the BIA decision affirming IJ Vomacka's ruling expressly disavowed some of IJ Vomacka's inappropriate comments, it did not mention some of IJ Vomacka's most egregious statements and inferences. And some of those statements and inferences seem likely to have infected the BIA's consideration of the merits of this case. Notably, the BIA did not mention how the intersection of criminal deportee status and homosexuality would affect Ali's likelihood of torture in Guyana. In this respect, it may well have followed IJ Vomacka in treating those traits as incompatible. Other aspects of the BIA's decision, meanwhile, cast doubt upon whether the BIA reviewed the record with care. For example, at one point the BIA stated that "[n]othing in the record indicates that criminal deportees have been harmed or tortured by Guyanese authorities," when, in fact, the record shows that the Guyana Police Force, which has been "pressured to monitor the whereabouts and activities of [criminal] deportees on a regular basis," has initiated a policy of intercepting deportees at the airport, resulting in interceptions that "include intensive interrogations involving severe physical abuse, arbitrary detentions and extra-judicial killings." The record also includes evidence that the police and police-connected vigilantes have taken violent action against supposed criminals, including criminal deportees. In sum, it is impossible to be confident that Ali has had "a fair and full opportunity to have his case considered," *Islam*, 469 F.3d at 55.

## V. CONCLUSION

We do not lightly reach our decision today. We recognize that Ali has now received three hearings on the merits of his CAT claim, that his case has twice been before the BIA, and that, given inconsistencies in the record that both IJs have noted, the agency may well reach the same decision on remand. In other words, Ali has, in one sense, received ample "process," and more process may lead to the same result. But "[n]o matter how complete the panoply of procedural devices which protect a particular liberty or property interest," fairness also requires "that those procedures be neutrally applied." *Ciechon v. City of Chicago*, 686 F.2d 511, 517 (7th Cir. 1982) (footnote omitted). Ali is entitled to a hearing that is conducted "in an unbiased way," and that allows the BIA and our Court to "conduct a meaningful review of the [IJ's decision]." *Islam*, 469 F.3d 55. This case will continue until Ali receives that hearing.

Accordingly, we VACATE the decision of the BIA and REMAND this case for further proceedings consistent with this opinion. In addition, while we recognize IJ Vomacka's extensive consideration of this matter, we instruct the BIA to assign this case to a different IJ on remand. *See Guo-Le Huang*, 453 F.3d at 151 (recognizing our "power to require reassignment when necessary to avoid repetition of a biased discharge of [the IJ's adjudicative] functions or even to avoid the appearance of substantial injustice").