# Matter of C-C-I-, Respondent

*Decided August 22, 2014*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Reopening of removal proceedings for a de novo hearing to consider termination of an alien's deferral of removal pursuant to 8 C.F.R. § 1208.17(d)(1) (2014), is warranted where the Government presents evidence that was not considered at the previous hearing if it is relevant to the possibility that the alien will be tortured in the country to which removal has been deferred.

(2) The doctrine of collateral estoppel does not prevent an Immigration Judge from reevaluating an alien's credibility in light of additional evidence presented at a hearing under 8 C.F.R. § 1208.17(d)(3).

FOR RESPONDENT: Robert A. Schmoll, Esquire, Atlanta, Georgia

FOR DEPARTMENT OF HOMELAND SECURITY: Renae M. Hansell, Senior Attorney

BEFORE: Board Panel: PAULEY, MALPHRUS, and GREER, Board Members.

GREER, Board Member:

This decision provides guidance on the regulatory process for terminating the deferral of an alien's removal granted pursuant to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"). We first address the evidentiary threshold for reopening proceedings to consider whether the deferral of removal should be terminated pursuant to 8 C.F.R. § 1208.17(d) (2014). We also consider the appropriate scope of a hearing on the termination of deferral of removal. In particular, we assess the applicability of the doctrine of collateral estoppel to the grant of deferral of removal in the subsequent termination hearing under 8 C.F.R. § 1208.17(d)(3).

## I.  FACTUAL AND PROCEDURAL HISTORY

The respondent entered the United States as a nonimmigrant student in 1982.  He subsequently adjusted his status to that of lawful permanent resident in 1983.  Proceedings were initiated against the respondent in 1998 with the issuance of a notice to appear, which alleged that he had been convicted of two crimes involving moral turpitude and an aggravated felony.

In a decision dated June 28, 1999, an Immigration Judge sustained the charges of deportability based on the respondent's convictions and ordered him removed to Nigeria.  It was not disputed that, because of his convictions, the respondent was only eligible to apply for deferral of removal.  The Immigration Judge granted the respondent's application for deferral of removal, which the Government appealed.  The Board dismissed the appeal on December 10, 2002.

On February 20, 2003, the Immigration Judge granted the Government's motion for a hearing to consider whether the respondent's deferral of removal should be terminated pursuant to 8 C.F.R. § 1208.17(d).  The motion was based on a report dated June 5, 2000, from the Consular Anti-Fraud Unit of the United States Embassy in Lagos, Nigeria, and a March 22, 2000, New York Times article pertaining to country conditions in Nigeria.  The Government argued this evidence established that the respondent's claim was fraudulent and he could no longer show it is more likely than not that he will be tortured in Nigeria.

The respondent was ordered removed in absentia after he did not appear for a number of scheduled hearings.  The in absentia removal order was later rescinded, and the removal proceedings were reopened on May 2, 2011.  Following the de novo hearing in 2012, at which the respondent testified regarding his application for deferral of removal, the Immigration Judge terminated the deferral of the respondent's removal to Nigeria on February 14, 2013.  In her decision, the Immigration Judge rejected the respondent's argument that the proceedings should not have been reopened, concluding that the evidence submitted in support of the motion to terminate deferral of removal met the standard required to reopen proceedings.  She therefore determined that it was appropriate to conduct the de novo hearing on the respondent's application for deferral of removal pursuant to 8 C.F.R. § 1208.17(d)(3).

The Immigration Judge found that the respondent was not credible.  Her adverse credibility finding was based primarily on inconsistencies about fundamental facts between the respondent's 1999 and 2012 testimony.  The Immigration Judge determined that his claim was not supported by sufficient corroborative evidence to overcome the lack of credible

testimony.  Consequently, the Immigration Judge terminated the deferral of the respondent's removal to Nigeria.

The Immigration Judge also found the respondent ineligible for a waiver of inadmissibility under former section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c) (1994).  She determined that the respondent was ineligible for the waiver because he was no longer a lawful permanent resident as a result of the June 28, 1999, final administrative order of removal and for other procedural reasons.  The respondent has appealed from the Immigration Judge's decision.

## II.  ISSUES

On appeal the respondent argues that the Government's motion for a de novo hearing to consider terminating the deferral of his removal should not have been granted as a matter of law.  He contends that the evidence submitted in support of the motion does not meet the evidentiary threshold contemplated in 8 C.F.R. § 1208.17(d)(1).  The respondent also argues that the Immigration Judge impermissibly relitigated the factual findings made in the prior Immigration Judge's June 28, 1999, decision, asserting that the doctrine of collateral estoppel forecloses the Immigration Judge from making new factual findings regarding the respondent's credibility and the likelihood of his prospective torture in Nigeria.  In addition, the respondent claims that the Immigration Judge made clearly erroneous factual findings regarding his credibility and his inability to establish that it is more likely than not that he will be tortured in Nigeria.  Finally, the respondent contends that he is eligible for a waiver of inadmissibility under former section 212(c) of the Act.

We must first determine whether the Government's motion for a hearing to consider termination of the deferral of the respondent's removal was supported by sufficient evidence "relevant to the possibility" that the respondent would be tortured in Nigeria, as required for reopening by 8 C.F.R. § 1208.17(d)(1).  We must then decide whether it was appropriate under 8 C.F.R. § 1208.17(d)(3) for the Immigration Judge to make new findings of fact, including a new adverse credibility finding that is at odds with the prior Immigration Judge's credibility determination.

## III.  TERMINATION OF DEFERRAL OF REMOVAL

Termination of deferral of removal at the initiation of the Department of Homeland Security ("DHS") involves two steps.  First, the DHS must file a motion supported by evidence that was not presented at the previous hearing and that is relevant to the possibility that the alien would be

tortured. 8 C.F.R. § 1208.17(d)(1). Second, if the motion is granted, the Immigration Judge must conduct a de novo hearing to consider whether the deferral of the alien's removal may be terminated. This requires an analysis to determine whether the alien can again establish that it is more likely than not that he will be tortured in the country to which his removal has been deferred. 8 C.F.R. § 1208.17(d)(3).

### A. Motion To Consider Termination of Deferral of Removal

The regulation governing the first step of the process provides as follows:

> At any time while deferral of removal is in effect, the INS District Counsel for the District with jurisdiction over an alien whose removal has been deferred under paragraph (a) of this section may file a motion with the Immigration Court . . . to schedule a hearing to consider whether deferral of removal should be terminated. The Service motion shall be granted if it is accompanied by *evidence that is relevant to the possibility that the alien would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing*. The Service motion shall not be subject to the requirements for reopening in §§ 3.2 and 3.23 of this chapter.

8 C.F.R. § 1208.17(d)(1) (emphasis added).[1] Thus, under the regulation, evidence "relevant to the possibility" that the alien would be tortured in the country to which removal has been ordered is sufficient to schedule a hearing to consider termination of deferral of removal.[2] The evidence may have been previously available as long as it was not presented and considered at the hearing where deferral of removal was granted. *See Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 240 n.3 (3d Cir. 2008) (recognizing that the ordinary requirements for a motion to reopen do not

---

[1] The references in the regulation to the former "INS District Counsel" and to "§§ 3.2 and 3.23 of this chapter" are remnants from the unified regulatory regime that preceded the creation of the DHS and the bifurcation of title 8 of the Code of Federal Regulations into the DHS regulations in chapter I and the Department of Justice regulations in chapter V. *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 9824, 9824 (Feb. 28, 2003) (Supplementary Information).

[2] As the Supplementary Information accompanying the regulation states, the purpose of this provision is to "provide for a streamlined termination process for deferral of removal," "so that deferral can be terminated quickly and efficiently when appropriate." Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8481−82 (Feb. 19, 1999) (Supplementary Information). Deferral of removal was designed to be more limited, less permanent, and more easily terminated than withholding of removal under section 241(b)(3)(B) of the Act. *Id.* at 8480.

apply to motions to terminate deferral of removal); *cf.* 8 C.F.R. §§ 1003.2(c)(1), 1003.23(b)(3) (2014) (providing the general requirements for the reopening of proceedings).[3]

The respondent argues that the Immigration Judge erred by "automatically" granting the motion for a hearing to consider whether his deferral of removal should be terminated. He contends that the evidence submitted in support of the motion was insufficient to meet the threshold for a de novo hearing on the deferral of his removal. In other words, the respondent claims that the DHS's evidence is not "relevant to the possibility" that he would be tortured in Nigeria. We disagree.

The prior Immigration Judge credited the respondent's testimony that his father was jailed in 1984 and publicly hanged in 1986 without judicial process, that his mother was jailed in 1987 and hanged in 1997 without judicial process, and that his brother was also hanged with his mother without judicial process. The Immigration Judge also credited the respondent's testimony that he voluntarily returned to Nigeria in 1995 to attend the funeral of his uncle, a political activist who was also hanged as a result of his political affiliation with the Ogoni tribe.

As corroboration for his testimony, the respondent submitted a "Medical Certificate of Cause of Death" from the University of Port Harcourt Teaching Hospital in Nigeria for each of his parents. The death certificate for the respondent's father reflects that he died on August 20, 1986, and his mother's death certificate reflects that she died on January 11, 1997.

The June 5, 2000, report from the Consular Anti-Fraud Unit of the United States Embassy in Lagos, Nigeria, which relates to the respondent's application for deferral, contradicts his claim. The report first states that the respondent "does not have any reason to fear returning to Nigeria" because "the current democratically-elected government has no interest in continuing the violent policies of the previous Abacha dictatorship towards the Ogoni people." The consular report also states that the "death certificate documents submitted in support of [the respondent's] application are fraudulent." As the report explains, "According to the Nigerian lawyers consulted, in Nigeria, when a person is executed for a Capital Offense, the

---

[3] A motion to terminate "will not be subject to the normal motion to reopen requirement that the moving party seek to offer evidence that was previously unavailable (i.e., could not have been discovered and presented at the previous hearing) and that establishes a *prima facie* case for termination" but will instead "be granted and a termination hearing will be scheduled on an expedited basis if the Service meets a *lower threshold, which requires only that the evidence was not considered at the previous hearing and is relevant to the possibility that the alien would be tortured in the country of removal*." 64 Fed. Reg. at 8482 (Supplementary Information) (second emphasis added).

body belongs to the Federal Government, therefore there is no way that the [respondent] could have gotten copies of 'death certificates' of his 'hanged relatives' from a private hospital source to submit as part of his application."

A New York Times article was appended to the consular report. Norimitsu Onishi, *Not for a Nigerian Hero the Peace of the Grave*, N.Y. Times, March 22, 2000, *available at* http://www.nytimes.com/2000/03/22 /world/not-for-a-nigerian-hero-the-peace-of-the-grave.html.   That article indicates that although the activist the respondent claimed was his uncle was executed in 1995, he never had a funeral or public burial, as the respondent testified. Rather, the article states that the Nigerian Government "dumped his body in an unmarked, common grave" and "kept its exact location a secret." The article further reports that the "newly elected president . . . immediately gave [the victim's] family permission to exhume the body for a proper funeral." As of the date of the article's publication, the remains were "still in the unmarked grave, intermingled with those of eight other Ogoni men who were also hanged."

The evidence in the consular report and the New York Times article contradicts the respondent's account of both his alleged uncle's burial and his parents' death certificates. This evidence "was not presented at the previous hearing" on June 28, 1999, and it is "relevant to the possibility" that the respondent would be tortured in Nigeria, as required by 8 C.F.R. § 1208.17(d)(1).[4]

The respondent argues that the consular report "is not competent evidence" because it contains hearsay within hearsay and the DHS did not make the author of the consular report available for examination in these proceedings.[5]   However, when considering whether the evidence is sufficient to warrant a de novo hearing on termination of deferral of removal, the inquiry is whether the evidence is "relevant to the possibility" that the respondent would be tortured in the country of removal, not the document's ultimate admissibility.[6] As explained above, this evidence

---

[4]  Evidence is "relevant" if it is "[l]ogically connected and tend[s] to prove or disprove a matter in issue [or] to persuade people of the probability or possibility of some alleged fact." *Black's Law Dictionary* 1316 (8th ed. 2004); *see also* Fed. R. Evid. 401(a) (stating that evidence is relevant "if it has any tendency to make a fact more or less probable than it would be without the evidence").

[5]  The respondent argues further that additional evidence submitted by the DHS at the hearing regarding the country conditions in Nigeria "focuses on issues that are, at best, ancillary" to the conditions in Nigeria. However, this evidence was not submitted in support of the motion, and the Immigration Judge did not rely on it in granting the motion.

[6]  In any case, we conclude below that the document was, in fact, admissible because it is probative and its use was not fundamentally unfair. *See infra* p. 384.

clearly meets the relevance standard. Accordingly, we conclude that the DHS met the evidentiary threshold for a de novo hearing pursuant to 8 C.F.R. § 1208.17(d)(1).

## B. De Novo Hearing

If the Immigration Judge grants the Government's motion to schedule a hearing to consider whether deferral of removal should be terminated, the regulations require the following:

> The immigration judge shall conduct a hearing and make a *de novo* determination, based on the record of proceeding and initial application in addition to any new evidence submitted by the Service or the alien, as to whether the alien is more likely than not to be tortured in the country to which removal has been deferred. This determination shall be made under the standards for eligibility set out in § 1208.16(c). The burden is on the alien to establish that it is more likely than not that he or she would be tortured in the country to which removal has been deferred.

8 C.F.R. § 1208.17(d)(3).[7]

At the termination hearing, the Immigration Judge found, as a factual matter, that the respondent did not establish that it is more likely than not that he will be tortured in Nigeria. *See* 8 C.F.R. §§ 1208.16(c)(2)–(3), 1208.17(a) (2013); *see also Zhou Hua Zhu v. U.S. Att'y Gen.*, 703 F.3d 1303, 1311−12 (11th Cir. 2013). This finding was based on the respondent's lack of credibility and his inability to meet the applicable burden of proof with corroborative documentary evidence alone. *See generally Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1231 (11th Cir. 2006) ("An IJ's denial of asylum relief, however, can be supported solely by an adverse credibility determination, especially if the alien fails to produce corroborating evidence.").

We find no clear error in the Immigration Judge's adverse credibility finding. *See Matter of R-S-H-*, 23 I&N Dec. 629, 637 (BIA 2003); 8 C.F.R. § 1003.1(d)(3)(i) (2014). Because the respondent's application was filed before May 11, 2005, his credibility is evaluated under the standards in

---

[7]  According to 8 C.F.R. § 1208.17(d)(2), prior to holding the termination hearing,

> [t]he Immigration Court shall provide notice to the alien and the Service of the time, place, and date of the termination hearing. Such notice shall inform the alien that the alien may supplement the information in his or her initial application for [deferral] of removal under the Convention Against Torture and shall provide that the alien must submit any such supplemental information within 10 calendar days of service of such notice (or 13 calendar days if service of such notice was by mail).

effect prior to the effective date of the REAL ID Act of 2005, Division B of Pub. L. No. 109-13, 119 Stat. 302. *See generally Matter of S-B-*, 24 I&N Dec. 42 (BIA 2006). Significant, material inconsistencies between the respondent's 1999 and 2012 testimony are apparent on the record. *Nreka v. U.S. Att'y Gen.*, 408 F.3d 1361, 1369 (11th Cir. 2005).

The Immigration Judge based the adverse credibility finding in part on the respondent's inability to credibly establish his identity or his nationality as Nigerian or Gambian. *See* 8 C.F.R. § 1208.16(c)(2) (providing that the applicant has the burden of proving eligibility for protection under the Convention Against Torture); *see also Matter of O-D-*, 21 I&N Dec. 1079, 1081 (BIA 1998) (stating that it is the alien's burden to establish his identity as a citizen and national of the country from which he seeks refuge). The Immigration Judge noted that the respondent testified in 2012 that he is Gambian, but in 1999 he testified that he is Nigerian. Although the respondent testified that he did not learn that he was born in the Gambia until 2002, he also stated that when he came to the United States as early as 1982, he knew that he could not obtain a legal Nigerian passport or birth certificate. He also acknowledged using a Nigerian passport that was not his when he traveled from the United States to England in 2002 (for a purpose other than to escape persecution). The Immigration Judge noted that the respondent is "without any properly issued identifying document" to establish his identity.

In addition to his discrepant testimony regarding his nationality, the respondent testified in 1999 that his religion is "Muslim" and that the United Nations has "a refugee camp for almost every Muslim, every Ogoni person . . . because they couldn't go home." However, when asked on January 11, 2012, if he could safely live anywhere in Nigeria, the respondent testified that he is a Christian. The respondent has not given any explanation for this discrepancy. *See Matter of A-S-*, 21 I&N Dec. 1106, 1110 (BIA 1998).

Furthermore, the respondent gave conflicting testimony about the deaths of his immediate family members in Nigeria. Originally, he testified that one brother was hanged with his mother in 1997 at the Bori military prison in Nigeria. But at the termination hearing in 2012, the respondent testified that a brother with a different name was killed in 1998 at an airport in Nigeria after that brother was granted asylum in South Africa. When asked if any of his brothers other than the one killed at the airport are deceased, the respondent answered, "No." The respondent provided no convincing explanation for this contradictory testimony on appeal.

The Immigration Judge also noted inconsistencies between the respondent's account of the 1995 funeral and burial of the activist he claimed was his uncle and the international media coverage stating that the

body was dumped in an unmarked mass grave, the location of which the Nigerian Government kept secret. The news articles describe the continuing efforts of the victim's family to recover his remains and conduct a proper burial. Given that a symbolic burial held in 2000 was covered by the international news media and drew tens of thousands of attendees, the Immigration Judge found it implausible that there would be no news coverage of or references to the alleged 1995 funeral. Although given the opportunity to do so, the respondent was not able to explain the discrepancy between his testimony and the news articles describing the treatment of the remains. *See Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1256 (11th Cir. 2006).

The Immigration Judge gave other valid reasons for the adverse credibility finding, including the respondent's demeanor and evasive testimony at his merits hearing in 2012, his criminal history involving fraudulent conduct, and his claimed membership in the Movement for the Actualization of the Sovereign State of Biafra ("MASSOB"), which the Immigration Judge found implausible in light of his contradictory testimony regarding the current state of Nigerian politics. In view of these significant inconsistencies and the other reasons identified by the Immigration Judge, we discern no clear error in her adverse credibility determination. *See Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005).

Additionally, some of the respondent's corroborating evidence further undermines his credibility, rather than supporting his claim. The respondent's testimony was inconsistent with that of one of his witnesses with regard to aspects of MASSOB's basic operations. Moreover, the respondent testified in 2012 that a brother was killed in 1998 at the Nigerian airport, but a 2011 declaration from another brother stated that the other brother in question "currently" had asylum status in South Africa. Although the respondent submitted a second 2012 declaration from his brother that conforms to his testimony, the Immigration Judge did not err in according the declarations diminished weight given this significant discrepancy.

The remainder of the respondent's corroborating evidence is insufficient to establish his claim in light of his lack of credibility. The respondent submitted the testimony and report of a doctor regarding scars on his back. Although the Immigration Judge found this evidence credible, she noted that it did not establish how or when the respondent sustained his injuries. Furthermore, with respect to the death certificates of the respondent's parents, the Immigration Judge found significant the respondent's testimony that he did not personally obtain them and did not know how his attorney obtained them.

Finally, at the 2012 hearing, the respondent presented a copy of a warrant he alleged was for his arrest and the testimony of a friend he claimed gave it to him. The Immigration Judge noted the discrepancy between the spelling of the name on the warrant and the name that the respondent gave her in court. Because the respondent did not provide any government-issued identifying documents, the Immigration Judge could not verify the correct spelling of his name. Moreover, given the respondent's lack of credibility, it was appropriate for the Immigration Judge to not credit the testimony regarding this warrant. *See Mohammed v. U.S. Att'y Gen.*, 547 F.3d 1340, 1347 (11th Cir. 2008) (stating that although the Immigration Judge was obligated to consider the alien's documentary evidence, he was "under no obligation to credit it or assign it decisive weight").

The respondent argues that the June 5, 2000, consular report submitted by the DHS with its motion to remand, which states that the respondent's parent's death certificates were fraudulent, is "not competent evidence" because it contains multiple levels of hearsay. However, hearsay evidence is admissible in removal proceedings where, as here, it is probative and its use is not fundamentally unfair. *See, e.g.*, *Matter of D-R-*, 25 I&N Dec. 445, 458, 460−61 (BIA 2011). The respondent had notice of the report and an opportunity to rebut it. *Cf. Alexandrov v. Gonzales*, 442 F.3d 395, 407 (6th Cir. 2006) (finding that the alien did not have adequate notice of the contents of a consular report); *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 406 (3d Cir. 2003) (same). Moreover, the Immigration Judge based the adverse credibility finding on other factors cited above. Under these circumstances, we conclude that the Immigration Judge did not err in admitting the report. *See Lyashchynska v. U.S. Att'y Gen.*, 676 F.3d 962, 971 (11th Cir. 2012) (upholding the Immigration Judge's reliance on a Department of State investigation where the asylum applicant "did not overcome the presumption of regularity afforded to government investigations"); *see also Angov v. Holder*, 736 F.3d 1263, 1276−77 (9th Cir. 2013) (rejecting the argument that a consular letter, which is "the unified work product of a U.S. government agency carrying out governmental responsibilities" and therefore "clothed with a presumption of regularity," must contain a "multitude of additional details" about the investigator and investigation to be admissible).

Given his lack of credible testimony and corroborating evidence, the respondent has not established that it is more likely than not that he will be tortured in Nigeria by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. *See* 8 C.F.R. § 1208.18(a)(1) (2014). Therefore, the respondent did not establish eligibility for protection under the Convention Against

Torture, and the Immigration Judge properly terminated the deferral of his removal. *See* 8 C.F.R. §§ 1208.16(d)(2), 1208.17(a); *Matter of J-F-F-*, 23 I&N Dec. 912 (A.G. 2006).

## C. Collateral Estoppel Doctrine

With respect to the adverse credibility finding, the respondent observes on appeal that "nearly half" of the inconsistencies identified in support of the adverse credibility finding arose as a result of his 2012 testimony. The respondent does not dispute that he testified inconsistently in 2012 with the testimony that he previously provided. Rather, he argues that the Immigration Judge is collaterally estopped from comparing the testimony that he gave at the 2012 merits hearing with his previous testimony in 1999. In the respondent's view, the doctrine of collateral estoppel should apply to prevent the reevaluation of his 1999 testimony and relitigation of any issue covered in the prior Immigration Judge's decision granting deferral of removal.

The respondent's collateral estoppel argument would negate the purpose of 8 C.F.R. § 1208.17(d), which allows for termination of deferral of removal where evidence relevant to the possibility that the alien would be tortured in the country of removal was not considered at the previous hearing. There is relevant evidence in this case that contradicts the first Immigration Judge's credibility finding, which was previously determined without its benefit. The regulation specifically provides for the Immigration Judge to consider the original application in light of additional evidence. 8 C.F.R. § 1208.17(d)(3) (stating that the Immigration Judge "shall make a *de novo* determination, based on the record of proceeding and initial application in addition to any new evidence" regarding the likelihood that the alien will be tortured in the country of removal).

Deferral of removal is not intended to provide permanent relief from removal. Rather, it is a temporary form of protection that accords the recipient no lawful immigration status and prevents the alien's refoulement only until removal is possible. *See Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008) (recognizing that a grant of deferral of removal is a temporary form of protection); 64 Fed. Reg. at 8480 (Supplementary Information) (stating that deferral is not a permanent form of protection and may be terminated if it becomes possible to remove the alien). The regulations provide that the alien's removal "shall be deferred until such time as the deferral is terminated under this section." 8 C.F.R. § 1208.17(b)(1).

The respondent relies on *Oyeniran v. Holder*, 672 F.3d 800 (9th Cir. 2012), as support for the proposition that the DHS is collaterally estopped

from relitigating the issues that were decided in the Immigration Judge's 1999 decision. In *Oyeniran*, the alien was granted deferral of removal to Nigeria based on his testimony and that of an expert witness and on documentary evidence, including police reports and newspaper articles. When the Government sought to terminate the grant of deferral of removal, it did not present evidence that contradicted the prior evidence. Rather, the Immigration Judge determined that the alien was not credible based on essentially the same evidence, because the alien and the expert witness "both ratified their prior testimony." *Id.* at 805.

The United States Court of Appeals for the Ninth Circuit reversed, holding that the DHS was "conclusively barred from re-litigating" the salient findings made in support of the initial grant of the alien's application for deferral of removal. *Id.* at 806. However, that case is distinguishable because the DHS did not present relevant evidence to contradict the previously provided evidence; nor did the alien provide fundamentally inconsistent testimony.

Furthermore, in *Ali v. Mukasey*, 529 F.3d at 478, the Second Circuit addressed the relevance of collateral estoppel in this context, and its interpretation is consistent with our view. The court recognized that deferral of removal is not a permanent form of protection, stating that the regulatory framework clearly contemplates that "the merits of the alien's [Convention Against Torture] claim may be revisited." *Id.* at 489. Accordingly, we find no merit to the respondent's arguments regarding collateral estoppel.

## IV. SECTION 212(c) WAIVER

Finally, the respondent argues that he is eligible to apply for a waiver of inadmissibility under former section 212(c) of the Act because he would have been eligible for such relief when he was convicted of mail fraud on January 17, 1992, and of unauthorized use of an access device on January 17, 1997.

The Immigration Judge concluded that the respondent was not eligible for section 212(c) relief primarily because she found that he had lost his lawful permanent resident status when a final administrative order of removal was entered against him on June 28, 1999. *See* 8 C.F.R. § 1212.3(f)(1)−(2) (2013) (stating that an application for relief under former section 212(c) shall be denied if the alien has not been lawfully admitted for permanent residence for at least 7 years prior to the filing of the application). Under 8 C.F.R. § 1001.1(p) (2014), an alien's permanent resident status terminates upon the entry of a final order of removal. However, notwithstanding those provisions, "a motion to reopen

proceedings for consideration or further consideration of an application for relief under section 212(c) of the Act . . . may be granted if the alien demonstrates that he or she was statutorily eligible for such relief prior to the entry of the administratively final order of deportation." 8 C.F.R. § 1003.2(c)(1). Accordingly, the relevant inquiry is whether the respondent was eligible for relief under former section 212(c) at the time of his final order of removal.

Given the recent evolution in jurisprudence regarding the availability of section 212(c) relief, we find it appropriate to remand the record for the Immigration Judge to consider the respondent's eligibility for a waiver. *See, e.g.*, *Judulang v. Holder*, 132 S. Ct. 476 (2011) (eliminating the comparable grounds approach for determining whether an alien is eligible for a waiver under former section 212(c)); *Matter of Abdelghany*, 26 I&N Dec. 254, 272 (BIA 2014) (providing new guidance regarding the availability of section 212(c) relief). Specifically, the Immigration Judge should make factual findings, including the dates of the respondent's offense, plea, and conviction. In this regard, she should also analyze the issues related to retroactivity and reliance that are necessary to make this determination in the first instance. *See Centurion v. Holder*, 755 F.3d 115 (2d Cir. 2014) (regarding retroactivity); *Oguejiofor v. Att'y Gen. of U.S.*, 277 F.3d 1305, 1310 n.6 (11th Cir. 2002) (same); 8 C.F.R. § 1212.3(f)(4) ("An application for relief under former section 212(c) shall be denied if . . . [t]he alien has been charged and found to be deportable or removable on the basis of a crime that is an aggravated felony, as defined in section 101(a)(43) of the Act (as in effect at the time the application for section 212(c) relief is adjudicated) . . . ."). Accordingly, the record will be remanded to the Immigration Judge for further proceedings.

**ORDER:** The record is remanded to the Immigration Judge for further proceedings consistent with the foregoing opinion and for the entry of a new decision.